Filed 12/27/18; Opinion following rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TYSHAUN VASQUEZ,<br><br>    Defendant and Appellant. | B281178<br><br>Los Angeles County<br>Super. Ct. No. BA432561 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bernie C. LaForteza, Judge. Reversed and remanded.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Under California law, the trial judge in a criminal case must instruct the jury on all lesser-included offenses supported by substantial evidence. Here, defense counsel requested an instruction on the lesser-included offense of involuntary manslaughter—an unlawful killing without malice. Counsel conceded that defendant Tyshaun Vasquez administered a beating that killed Eddie Ray Smith, Jr., but argued that defendant was not subjectively aware his actions could be deadly because Smith had a hidden spinal injury (metal rods had been placed in his neck in a prior surgery), the fatal injury was immediately adjacent to the metal rods, and the victim's other injuries were relatively minor. Defendant contends that the trial court should have granted his instructional request because there was substantial evidence to support the instruction and that the error was prejudicial. We agree and reverse the judgment.[1]

## PROCEDURAL BACKGROUND

By information filed January 6, 2016, defendant and codefendant Jordan E. were each charged with one count of special-circumstance first degree murder (Pen. Code,[2] §§ 187, subd. (a), 190.2, subd. (a)(17); count 1) and one count of attempted second degree robbery (§ 664/211; count 2). Count 2 further alleged that Jordan personally used a deadly weapon (a trash can) in the commission of the offense (§ 12022,

---

[1] Because we reverse on this basis, we do not reach defendant's additional arguments.

[2] All undesignated statutory references are to the Penal Code.

subd. (b)(1)).[3] Defendant pled not guilty and denied the special circumstance.

Trial was by jury. Defendant did not testify. The court denied his request to instruct on involuntary manslaughter as a lesser-included offense of murder but granted his request to instruct on second degree murder. The jury convicted defendant of second degree murder. It acquitted him of first degree murder and attempted robbery and found the special-circumstance allegation not true.

Defendant moved for a new trial, again arguing that the court should have instructed the jury on involuntary manslaughter. The court denied the motion and sentenced defendant to 15 years to life in state prison for count 1. The court awarded him 793 days actual custody credit and 0 days local conduct credit.

Defendant filed a timely notice of appeal.

## FACTUAL BACKGROUND

On November 30, 2014, at around 12:30 a.m., defendant and Jordan were hanging out in the skate area of Rancho La Cienega Park in Los Angeles. There, they encountered Smith. According to Angel T., the sole eyewitness at trial, when defendant and Jordan saw Smith, defendant said, "let's go get that guy. Let's see if he got money or jewelry or anything like that stuff." The 43-year-old Smith was "skinny": 5 feet 10 inches tall and 129 pounds. In contrast, defendant was 19 and "notably" taller and heavier than Smith.

---

[3] Jordan's case was subsequently transferred to juvenile court. He is not a party to this appeal.

Defendant and Jordan approached Smith and grabbed him. Defendant dug around in Smith's pockets. It is unclear whether he took anything. Jordan and defendant then punched Smith about 15 times, knocking him to the ground. While Smith was on the ground, defendant stomped on his head "and like his whole body pretty much" approximately 20 times. Smith, meanwhile, was yelling for help. As defendant stomped on Smith, Jordan picked up a nearby metal trash can and threw it at Smith, hitting him in the right side of the hip. Eventually, defendant and Jordan left the scene.

Soon after the incident, Joel Williams, then a firefighter with the Los Angeles Fire Department, responded to the scene after being flagged down by a woman in the park. Williams saw that the man on the ground, whom he later identified as Smith, needed medical attention. Williams moved the trash can he found on Smith's body and after performing a standard examination, determined that Smith was dead.

Kevin Young, a medical examiner for the Los Angeles County Department of Medical Examiner-Coroner, performed the autopsy. Young noted a variety of external injuries to Smith's body: trauma on both sides of his head; abrasions on his forehead, temple, and cheek; lacerations on the side of his eye; a swollen right ear with a hematoma and blood and abrasions in front of and behind it; and other injuries. Each of these injuries, considered alone, was nonlethal. All were premortem.

Young also found one significant internal injury: a neck fracture in the C2-C3 vertebrae, just below the jawline. This injury, which can be fatal because it restricts breathing, was likely caused by impact wounds to Smith's head: blunt force trauma was determined to be a "substantial contributing factor"

to Smith's death. Young noted that during a prior orthopedic surgery, metal rods had been inserted into Smith's neck directly adjacent to the fracture. That surgery and the rods compromised Smith's neck strength and made him more susceptible to a neck injury in the area. Indeed, because the break occurred right at the edge of the metal rod, the rod could have acted as a fulcrum and contributed to the break.

Still, it would take a high-impact event to cause a serious injury to Smith's neck. Getting punched in the neck would "probably not" be enough. In addition, falling or getting punched in the face likely would not have created a high enough impact to fracture Smith's neck. But getting stomped in the head—either once or repeatedly—or being hit with a metal trash can could be enough to cause a fracture. The location of the impact would have affected the severity of the injury, since the rods made Smith's neck weaker in some areas, such as at the C2-C3 vertebrae, but did not weaken his neck as much in other areas. And Young testified that Smith did not have any other serious head or neck injuries, such as a fractured skull, tooth damage, intracranial bleeding, or brain bruises.

In the examination, Young also inventoried Smith's personal effects. Smith had 12 cents, a wallet, a social security card, multiple credit cards, and a cell phone, but no jewelry.

## DISCUSSION

Defendant contends the trial court's refusal to instruct on involuntary manslaughter as a lesser-included offense to murder was erroneous and prejudicial. The People argue the instruction was not supported by substantial evidence and overwhelming evidence rendered any error harmless. We conclude there was substantial evidence that defendant acted without malice and

5

there is a reasonable probability that he would have obtained a more favorable outcome if the involuntary manslaughter instruction had been given.

### 1. Instructional Duty and Standard of Review

"California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149, 154–155, 162 (*Breverman*).) The requirement applies when there is substantial evidence that the defendant committed the lesser offense instead of the greater offense. (*Id.* at pp. 162, 177.)

"In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Breverman*, *supra*, 19 Cal.4th at p. 177.) Thus, "courts should not evaluate the credibility of witnesses, a task for the jury" (*id.* at p. 162), and uncertainty about whether the evidence is sufficient to warrant instructions should be resolved in favor of the accused (*People v. Tufunga* (1999) 21 Cal.4th 935, 944). Even evidence that is unconvincing or subject to justifiable suspicion may constitute substantial evidence and may trigger the lesser-included-offense requirement. (*People v. Turner* (1990) 50 Cal.3d 668, 690.)

When the defense requests the instruction, the refusal to instruct on a lesser-included offense may also violate the federal constitution's requirement that the courts afford every criminal defendant " 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690; *People v. Rogers* (2006) 39 Cal.4th 826, 868, fn. 16.) As part of this right, a defendant is " 'entitled to adequate instructions on the defense theory of the case' if supported by the law and evidence [citation]

and ' "has a constitutional right to have the jury determine every material issue presented by the evidence …" ' [citation]." (*People v. Eid* (2010) 187 Cal.App.4th 859, 879; *People v. Cash* (2002) 28 Cal.4th 703, 736 ["Defendants have a constitutional right to have the jury determine every material issue presented by the evidence, and a trial court's failure to instruct on lesser included offenses denies them that right."].)

We review de novo the trial court's failure or refusal to instruct on a lesser-included offense. (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

## 2. Involuntary manslaughter is a lesser-included offense of murder.

Murder is "the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).)[4] Malice may be express or implied. (§ 188.) Express malice is the intent to kill, whereas implied malice exists "where the defendant … acted with conscious disregard that the natural and probable consequences of [his] act or actions were dangerous to human life. [Citation.]" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197.)

Implied malice has both objective and subjective components. The objective test requires " ' "an act, the natural consequences of which are dangerous to life … ." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) This means the act must carry " 'a high degree of probability that it will result in death.' " (*Id.* at p. 152.) The subjective test requires that the act be

---

[4] While felony murder does not require malice, the jury in this case rejected that theory when it acquitted defendant of both first degree murder and attempted robbery and found the robbery-murder special circumstance not true. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654.)

7

performed " ' "by a person who knows that his conduct endangers the life of another … ." ' " (*Id*. at p. 143.) "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Ibid*.)

An unlawful killing *without* malice is involuntary manslaughter. (§ 192; see, e.g., *People v. Blakeley* (2000) 23 Cal.4th 82, 91; *People v. Butler* (2010) 187 Cal.App.4th 998, 1008–1009 [addressing the difference between implied malice murder and involuntary manslaughter]; CALCRIM No. 580.)[5] "Generally, involuntary manslaughter is a lesser offense included within the offense of murder." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) Accordingly, an instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant acted without conscious disregard for human life and did not form the intent to kill.[6]

3. **The court denied defendant's requests for an instruction on involuntary manslaughter.**

After the prosecution rested, the court held a hearing to discuss jury instructions. Defense counsel asked the court to instruct the jury on involuntary manslaughter based on a lack of malice. Counsel's theory was that if the jury rejected Angel's testimony, it would have to acquit defendant of attempted robbery, felony murder, and the special circumstance. At that

---

[5] Voluntary manslaughter is not at issue in this case.

[6] An unlawful killing may also amount to involuntary manslaughter under a misdemeanor-manslaughter theory (§ 192, subd. (b)), but that rule is not at issue here. (See, e.g., *People v. Lee* (1999) 20 Cal.4th 47, 60–61 [court erred in failing to instruct sua sponte on misdemeanor-manslaughter theory of involuntary manslaughter].)

8

point, the only contested issue would be defendant's intent—that is, whether he acted with malice.

Defense counsel explained that in light of "the coroner's testimony that none of the [other] blows were fatal and given the fulcrum of where the neck was broken, there was no intent to kill." Though defendant committed an unlawful act, it was "a freak thing." "Beating someone badly, but not inflicting deadly blows, not knowing that the person had prior … cervical surgery before, how would anybody know? Again, there's no intent to kill. It's a terrible thing that happened, but if the jury rejects—again, rejects count 2 [attempted robbery] and the permutations of it, you know, we're left with regular murder or manslaughter. And, again, that's a question of fact for the jury to decide, the intent aspect. If there's no intent to kill, it can be nothing but involuntary manslaughter."

The prosecutor responded that "if this were a fistfight, I totally get where counsel is coming from. But someone lying on the ground being stomped on 20 times is evidence that—I don't see how a person is not aware that that behavior can result in death and disregard it, the likelihood of someone dying from that behavior."

The following day, the court issued a written statement of decision denying counsel's request for an involuntary manslaughter instruction. The court made various factual findings, including that "defendant stomped approximately 20 times [on] the victim's head and body in a forceful manner." The court then concluded the evidence did not support the instruction because "defendant did not simply start a fistfight in which an unlucky blow resulted in the victim's death. He savagely beat and stomped the victim to death." Because this was felonious conduct,

the court declined to give the instruction. (See *Breverman*, *supra*, 19 Cal.4th at pp. 162, 177 [court may not weigh the evidence or evaluate witness credibility when deciding whether substantial evidence supports an instruction on lesser-included offense].)

Defense counsel urged the court to reconsider its decision. While the court might not have been required to give the instruction sua sponte, counsel argued, it *was* required to give it upon request. Counsel explained that Smith's broken neck was an anomaly, and "given the facts that none of the injuries, internal or external, described by Dr. Young were fatal or life-threatening, [ ] the perpetrator would not know the natural and probable consequences would be" dangerous to human life. The significance of this evidence was "for the trier of fact to make the determination with regards to malice, to intent."

Indeed, counsel revealed that if the court *did* give the involuntary manslaughter instruction, he would not even ask the jury to acquit; he would instead ask the jury to convict defendant of involuntary manslaughter. "My client should be held responsible for what he did," counsel explained. "But to say that the jury should not even consider [involuntary manslaughter] because of the nature of the beating, that someone should know that the natural consequences would be dangerous to human life, I don't think that's the situation given the type of injuries and based on the coroner's testimony."

Finally, counsel emphasized that "the court is precluding me from arguing a defense that I laid out at the very beginning, during voir dire. I was that confident, given the nature of the injuries."

After hearing further argument, the court again denied counsel's request for the instruction.

10

**4. There was substantial evidence from which the jury could conclude defendant acted without malice.**

As discussed, a defendant acts without implied malice if he lacks a subjective awareness that his conduct carries " 'a high degree of probability that it will result in death.' " (*People v. Knoller, supra,* 41 Cal.4th at p. 152.) When viewed in the light most favorable to defendant, there was substantial evidence in this case from which a reasonable juror could conclude defendant was not subjectively aware that his actions could kill Smith. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137 [sufficiency of the evidence supporting lesser-included offense instruction viewed in the light most favorable to the defendant].)

California courts have long recognized that not all beatings are life-threatening. "Normally, hitting a person with the hands or feet does not constitute murder in any degree. [Citations.] But if death … is a reasonable or probable consequence of the beating the offense may be murder. [Citation.] Thus, to constitute murder there has to be either an intent to kill or such *wanton and brutal* use of the hands [or feet] without provocation as to indicate that they would cause death … ." (*People v. Teixeira* (1955) 136 Cal.App.2d 136, 150, italics added; accord, *People v. Cravens* (2012) 53 Cal.4th 500, 508 ["This state has long recognized 'that [while] an assault with the fist … may be made in such a manner and under such circumstances as to make the killing murder' [citation] … 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.' [Citation.]"].)

Here, there was sufficient evidence from which the jury could have reasonably concluded that the beating defendant

11

administered to Smith was not so wanton and brutal as to demonstrate a conscious disregard for human life. Young, the medical examiner, testified that almost all of Smith's injuries—taken alone—were nonlethal. Smith did not suffer a fractured skull, tooth damage, intracranial bleeding, or brain bruises, which might be expected from multiple high-impact blows to the head. As to Smith's neck specifically, a prior surgery had inserted metal rods into his neck and spine, making Smith vulnerable to a serious neck injury in the precise spot where the break occurred. The weakness of Smith's neck was not visible externally. And Young agreed that since Smith's neck snapped at a point immediately adjacent to the end of the metal rod, the rod could have acted as a fulcrum, thereby increasing the force on that area. A reasonable juror could have inferred from this evidence that the blows were not particularly severe and further inferred that defendant believed beating up Smith would injure him but not kill him.

The People cite two cases in support of their claim that no substantial evidence supported an involuntary manslaughter instruction here. Both are inapt.

In *Guillen*, the manner and circumstances of a jail assault on a murder victim provided sufficient evidence, under an aiding and abetting theory, to support the jury's conclusion that each defendant inmate was subjectively aware that the natural and probable consequences of his conduct were dangerous to life. (*People v. Guillen* (2014) 227 Cal.App.4th 934, 982–992 (*Guillen*).) In that case, the victim, a child molester, was escorted to one of the only places in the jail where deputies could not see an attack. (*Id.* at pp. 985–986.) Between 30 and 50 inmates assaulted the victim—by hitting him, kicking him, stomping on him, spanking

12

him, spitting on him, urinating on him, spilling hot coffee on him, stripping off his clothes, and putting foreign items in his rectum—and the victim's injuries, which included 21 broken ribs, a punctured lung, and a hemorrhagic back, were consistent with a high-velocity car accident or a fall from multiple stories. (*Ibid*.) The court concluded a reasonable person would have understood that this type of vicious group assault could be fatal. (*Id*. at pp. 988–989.)

Unlike in *Guillen*, in which the court assessed whether the evidence was sufficient to support the *verdict*, we must decide whether there was sufficient evidence to warrant an instruction on a lesser-included offense. Thus, whereas *Guillen* viewed the evidence in the light most favorable to the prosecution, we must view the evidence in the light most favorable to the defense. (*People v. Millbrook, supra*, 222 Cal.App.4th at p. 1137.) And while the *Guillen* victim's premortem injuries were consistent with a fall from a tall building, here, other than the blow to the neck, all of Smith's injuries were nonlethal. Finally, unlike in *Guillen*, the prosecution here did not argue—and the jury was not instructed—that defendant acted in concert with or aided and abetted Jordan.

In *Evers*, the other case cited by the People, the court concluded there was no error in failing to instruct on involuntary manslaughter where the child victim suffered severe injuries, and evidence of the defendant's prior child abuse established he was aware of the risk of his actions. (*People v. Evers* (1992) 10 Cal.App.4th 588.) In that case, there was undisputed evidence the deceased child suffered physical injuries equivalent to those that would result from a 10-to-30-foot fall. (*Id*. at p. 597.) The record established the defendant had used violent force against

the child in the past, and he, therefore, must have been aware of the risk of death. (*Id*. at p. 598.) There was no similar evidence here.

In sum, because there was substantial evidence in this case from which a reasonable juror could have doubted that defendant was subjectively aware the beating could kill Smith, the court was required to instruct on the lesser-included offense of involuntary manslaughter.

## 5.     The error was prejudicial.

In a non-capital case, the erroneous failure to instruct on a lesser-included offense is typically an error of state law. (*People v. Rogers*, *supra*, 39 Cal.4th at pp. 867–868.)[7] Thus, we must reverse if there is a reasonable probability that the defendant would have obtained a more favorable outcome if the instruction had been given. (*Breverman*, *supra*, 19 Cal.4th at p. 178; *People v. Soojian* (2010) 190 Cal.App.4th 491, 520–521 [a hung jury is a more favorable result than a guilty verdict].) A reasonable probability "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. [Citations.]" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) An error is prejudicial whenever the defendant can " 'undermine confidence' " in the result achieved at trial. (*Ibid.*, quoting *People v. Watson* (1956) 46 Cal.2d 818, 837.) "In assessing prejudice, we consider both the magnitude of the error and the closeness of the case." (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1041.)

---

[7] Because we conclude the error here was prejudicial under state law, we do not address whether it also violated defendant's federal constitutional rights.

The rationale for requiring courts to instruct on lesser-included offenses is to avoid forcing the jury into an " 'unwarranted all-or-nothing choice' " that creates the risk the jury will convict on the charged offense even though one of the elements remains in doubt because " 'the defendant is plainly guilty of *some* offense.' " (*People v. Hughes* (2002) 27 Cal.4th 287, 365; accord, *People v. Majors* (1998) 18 Cal.4th 385, 410 ["One of the primary reasons for requiring instructions on lesser included offenses is … to eliminate ' "the risk that the jury will convict ... simply to avoid setting the defendant free." ' [Citation.]"]; *People v. Barton* (1995) 12 Cal.4th 186, 196, 203 [" 'Our courts are not gambling halls but forums for the discovery of truth.' " The "jury's truth-ascertainment function" is impaired unless it is provided with "the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence"].)

Under the instructions given in this case, the jury was forced to choose between convicting defendant of second degree murder and acquitting him entirely. As we shall explain, there is a reasonable probability that the jury chose second degree murder to avoid the more implausible alternative that defendant was not guilty of any crime. Put another way, we hold there is a reasonable probability that at least one juror would have voted to convict defendant of involuntary manslaughter if given the chance.

### 5.1. The instruction embodied the defense theory of the case.

The failure to instruct on a lesser-included offense is more likely to be prejudicial where it strikes at the heart of the defense. (*People v. Neidinger* (2006) 40 Cal.4th 67, 79; see *People v. McDonald* (1984) 37 Cal.3d 351, 376 ["An error that impairs

15

the jury's determination of an issue that is both critical and closely balanced will rarely be harmless."].)

Here, counsel structured the entire defense around one element: malice. In his opening statement, counsel explained that defendant, "right or wrong, has a penchant for getting into stupid fights. Okay? Nothing to do with attempted robberies or—just getting into fights all the time." Counsel acknowledged Smith was beaten. But most of Smith's injuries were nonlethal. And, counsel explained, Smith had prior injuries that had compromised the vertebrae in the very spot in which his neck broke. Counsel, therefore, concluded his opening statement by telling the jury, "I would suggest to you that at the end of the day that you're going to find … that this is in fact an involuntary manslaughter."

The cross-examination of the medical examiner was also structured around malice. For example, counsel asked Young about each of Smith's injuries and confirmed that none of them was potentially fatal. He confirmed Smith's teeth were intact, that his skull was not fractured, and that there was no trauma to his brain. Then, counsel spent the bulk of cross-examination asking Young about the relationship between Smith's prior neck injury and his death. Counsel elicited testimony that the break itself was right on the edge of the metal rods, and those rods could have acted as a fulcrum that helped cause the break. As he explained when he requested the instruction, this was the foundation of counsel's theory that defendant acted without conscious disregard for human life.

Yet after asking the jury in his opening statement to convict of involuntary manslaughter, in his closing argument, counsel asked them to acquit entirely. He still conceded the other

elements: "There's no issue whether Tyshaun Vasquez was involved in this case. … That's not an issue here. The issue is a question of was there a crime committed and what is that crime?" And he still focused on intent: did defendant know that death was a natural and probable consequence of his actions?

Counsel made it clear, however, that he didn't think an acquittal was the right result. For example, he explained, "In this case, the prosecution chose to file murder. Granted, there's two theories that the prosecutor has in this case, but they chose to file murder. Didn't choose to file manslaughter, didn't choose to file justifiable homicide. Those are not issues. The issue before us is what the prosecutor chose to file, and you have to address that. You have to deal with that." Again: "We all agree people should be held responsible for what they do, but in a court situation, we're limited to what's charged. Again, it's a homicide. The prosecution has a lot of ways to charge homicide. … The choice was made by the prosecutor here."

In the end, without an instruction on involuntary manslaughter, defense counsel was left to tell the jury this: "You know, I'd love to tell you, sure, hold Tyshaun responsible; but based on what we have here and now, this case has not been proven beyond a reasonable doubt. It's just the way it was pled."

The court's refusal to instruct the jury on the lesser-included offense of involuntary manslaughter placed defense counsel in the untenable position of arguing that his client—who had plainly killed a man—should be set free.

## 5.2.   The evidence of malice was not overwhelming.

The People insist the court's refusal to instruct on involuntary manslaughter was harmless because "there was overwhelming evidence of malice in this case. … [Defendant]

17

cannot credibly claim that stomping on the victim's head and upper body 20 times did not constitute 'malice' sufficient for second degree murder."

We disagree. As discussed above, there was sufficient evidence from which a reasonable juror could conclude defendant did not intend to kill Smith. Most of Smith's injuries were nonlethal. To be sure, that defendant unwittingly chose a victim with a preexisting neck condition would usually be irrelevant, for a defendant takes his victim as he finds him and should not benefit from picking a vulnerable one. Here, however, Smith's prior neck injury speaks to defendant's subjective awareness of the consequences of his actions because it could show that defendant did not intend to beat Smith badly enough to kill him.

Nor do the People's two cited authorities—provided without any discussion or analysis—support their position.

In *Moye*, the court concluded any error in failing to instruct the jury sua sponte on a heat-of-passion theory of voluntary manslaughter—in addition to instructions that were given on imperfect self-defense manslaughter—was harmless under state law. (*People v. Moye* (2009) 47 Cal.4th 537, 557–558 (*Moye*).) There, the jury heard and rejected defendant's theories of self-defense and imperfect self-defense. (*Id.* at p. 558.) Once it did so, there was little (if any) evidence to support the claim that he was acting in a subjective "heat of passion" when killing the victim. Specifically, defendant's testimony that the victim kicked his car and attacked him with a bat did not amount to legally sufficient provocation required for a heat-of-passion defense unrelated to the perceived need for self-defense. (*Ibid*.) But the evidence *did* establish that after enlisting the help of two compatriots, the defendant found the victim, chased him "over a chain link fence

and through a field, caught him and bludgeoned him to death with a baseball bat, after which defendant disposed of the bloodied murder weapon in a nearby storm drain." (*Id.* at p. 557) The strength of this evidence, coupled with the jury's rejection of the self-defense claim, rendered the error harmless.

In *Flood*, the trial court failed to instruct the jury that to convict the defendant of evading a peace officer, the prosecution was required to prove that the defendant evaded *actual* peace officers. (*People v. Flood* (1998) 18 Cal.4th 470, 505 (*Flood*).) The court found the error harmless under the *Chapman v. California* (1967) 386 U.S. 18 test for federal constitutional errors because the "[d]efendant never referred to this element of the crime during the trial and did not argue to the jury that the prosecution had failed to prove this element beyond a reasonable doubt; indeed, he did not ask that the issue even be considered by the jury. Furthermore, defendant presented no evidence regarding the peace officer element, and failed to dispute the prosecution's evidence regarding the issue." (*Flood*, at p. 505.) These actions were "tantamount to a concession" of the element. (*Ibid.*)

Moreover, the *Flood* court noted, "the verdict demonstrate[d] that the jury resolved every contested issue in favor of the prosecution and, in particular, credited the testimony of all of the witnesses who testified regarding [the officers'] status as peace officers. On the only issue related to the 'peace officer' issue that defendant actually contested, the jury rejected defendant's contention and found that the motor vehicle in which the officers were driving was 'distinctively marked.' " (*Flood, supra*, 18 Cal.4th at p. 505.)

Unlike *Moye*, the case before us is not one in which the jury rejected other theories of guilt in favor of one requiring a more

19

culpable mental state, indicating that if properly instructed, the jury would still have found defendant guilty of a crime greater than involuntary manslaughter. And unlike *Flood*, this is not a case in which the jury demonstrably decided every contested issue in favor of the prosecution and fully credited every prosecution witness. To the contrary, the jury's verdicts here— acquitting defendant of premeditated murder, acquitting defendant of felony murder, acquitting defendant of attempted robbery, and finding the attempted-robbery special circumstance not true—indicate it rejected the prosecution's theory of the case. Furthermore, since Angel provided the only evidence to support the attempted robbery count, the jury apparently rejected or found problematic at least some of Angel's testimony.

Nor is this a case in which the court failed to instruct on a peripheral issue, as in *Moye*, or a conceded element, as in *Flood*. Unlike the trial courts in those cases, the court here refused repeated defense requests to instruct on a lesser crime that embodied the entire defense. Here, the court refused to instruct on a lesser crime that targeted the flaws in the **only** element the defense contested.

### 5.3. The jury struggled with its verdict.

" 'The necessity for instructions on lesser included offenses is based in the defendant's constitutional right to have the jury determine every material issue presented by the evidence. [Citations.] … "True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the

20

substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction." [Citation.]' [Citation.]" (*People v. Tinajero* (1993) 19 Cal.App.4th 1541, 1547.)

There is evidence here that the jury struggled with just this problem. As discussed, the defense did not contest identity and conceded that defendant killed Smith. Defendant's *only* claim was that he lacked malice. Indeed, defense counsel acknowledged that ideally, defendant *should* be convicted of something, and lamented that the prosecution's charging decision placed the jury in such a difficult position. Yet without an involuntary manslaughter instruction, the jury was left to decide between first degree murder, second degree murder, and … nothing. As we have discussed at length above, the error went to the heart of the defense case that defendant did not try to rob Smith and didn't know the beating could kill him.

The jury agreed with that theory—at least in part. Jurors acquitted defendant of premeditated murder. They acquitted him of felony murder. And they acquitted him of attempted robbery. In so doing, they rejected the prosecutor's theory of the case and at least some of Angel's testimony. (See *People v. Mullendore* (2014) 230 Cal.App.4th 848, 857 [failure to instruct on a lesser-included offense was prejudicial where jury's decision to convict on another count indicated doubts about the defendant's use of force].) The jury deliberated for two days, asked several questions, and received supplemental closing arguments. (See *People v. Cardenas* (1982) 31 Cal.3d 897, 907 [six hours of deliberations is evidence of a close case]; *People v. Woods* (1991) 226 Cal.App.3d 1037, 1052 [failure to give lesser-included offense

21

instruction was prejudicial where three days of deliberations and request for read-back indicate close case]; *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 ["Juror questions and requests to have testimony reread are indications the deliberations were close. [Citations.]"].) As such, it is reasonably probable defendant would have achieved a better result if the jury had been properly instructed. Therefore, defendant's conviction must be reversed.

## DISPOSITION

The judgment is reversed, and the matter is remanded for retrial.

## CERTIFIED FOR PUBLICATION

LAVIN, J.

WE CONCUR:


EDMON, P. J.


KALRA, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.