Filed 4/22/21  P. v. Phon CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>SURIND PHON,<br><br>　　　Defendant and Appellant. | B304495<br><br>(Los Angeles County<br>Super. Ct. No. NA108856) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge.  Affirmed.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul Roadarmel, Jr. and Stephanie M. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Surind Phon of second degree murder after he drove alongside another car and fatally shot the other driver. He contends that his conviction must be reversed because the trial court refused his request to instruct the jury on the lesser included offense of involuntary manslaughter. We affirm.

## PROCEDURAL HISTORY

An information filed on June 20, 2019 charged appellant with the February 23, 2018 murder of Glen Chico (Pen. Code, § 187, subd. (a)[1]; count one), shooting at an occupied motor vehicle (§ 246; count two), and shooting from a motor vehicle (§ 26100, subd. (d); count three). The information further alleged that appellant personally and intentionally discharged a firearm, causing great bodily injury and death (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), personally used a firearm (§ 12022.53, subd. (b)), and suffered four prior convictions (§ 667.5, subd. (b)). Appellant pled not guilty and denied the enhancement allegations.

At appellant's jury trial, on count one the trial court instructed the jury on second degree murder, as well as the lesser included offense of voluntary manslaughter. The court denied appellant's request to include an instruction on the lesser included offense of involuntary manslaughter. The jury found appellant guilty as charged on all three counts and found true all of the firearm enhancement allegations.

Following a court trial on the prior conviction allegations, the court found those allegations true. The trial court sentenced

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

appellant to a total of 40 years to life in prison: a base term of 15 years to life on count one, plus 25 years to life for the section 12022.53, subdivision (d) enhancement, with terms of seven years each on counts two and three, stayed pursuant to section 654. Appellant timely appealed.

## FACTUAL BACKGROUND

### I.  *Prosecution Evidence*

#### A.  *The Shooting*

Savoeun Van[2] testified that she was friends with the victim, Glen Chico. She was also in a sexual relationship with appellant at the time and they would use methamphetamine together. Around midnight on February 23, 2018, Chico dropped Van off at a restaurant in Long Beach. Chico was driving Van's car, a Mitsubishi Eclipse Spider. Van asked Chico to drop her off, after which he had permission to borrow her car. Before he dropped her off, they smoked methamphetamine together. Chico asked if she was going to meet another man; Van lied and said she was not.

Van was planning to meet appellant at the restaurant. After Chico dropped her off, Van called appellant to pick her up, telling him that her ex-boyfriend, Sina Konhu, took her car.[3] Van also said that while she was trying to get a job at a club, Konhu "jump[ed] in the driver [seat] and just took my car." Van testified that she said this because she did not want appellant to know about Chico.

---

[2] Van also used the first name Samantha.

[3] Van testified that she had ended her relationship with Konhu about a month prior. He had been physically abusive toward her.

Chico left the parking lot after dropping Van off, but then returned. Van saw him driving nearby and texted him to go home. Appellant arrived, and Van got into his Mazda. She testified that appellant was "really angry and, like, a madman," and yelling because she was not answering her phone. Appellant asked her, "where the fuck is your car?" Van was too scared to tell him that she had given Chico permission to borrow her car. At that point, they saw Van's car drive by the parking lot and appellant said, "there is your car." She told him, "it's okay. Let it go." But appellant drove after her car.

Van testified that she hid on the floor of the front passenger side of appellant's car. As they drove after Chico, she saw appellant take his gun out of his pocket and hold it against his right thigh. When she saw the gun, she said, "Don't do nothing stupid, please." As they pulled alongside Van's car, appellant told Chico to "get out" and "pull over," and she heard Chico say, "I am going home. I don't want no problem." Van told appellant again to "let it go" and also begged him, "don't shoot." Then she saw appellant aim the gun at her car. He pointed the gun out of his open passenger-side window and fired one shot. Van testified during direct examination that she asked appellant if he shot at her car and he said, "yes." However, during cross-examination, she stated that appellant actually said "don't worry, ma. I shot at the air."

Just before appellant fired, Van grabbed his arm, which was pointing the gun. She later clarified that she did not grab his arm, but patted him on the arm, while his hand was still on his thigh, and said, "please don't." She did not touch him while he was aiming the gun. Van testified that she told police that she was begging appellant not to shoot and he was yelling, "Why are

4

you trying to stop me?" Appellant also told her that the reason he shot was because she was begging him not to.

After firing the shot, appellant kept driving. Van learned later that Chico had died.

Officers from the Long Beach Police Department (LBPD) responded to the scene at the 710 freeway entrance around 12:42 a.m. on February 23, 2018. They saw a white Mitsubishi Spider on the embankment of the on-ramp. There was a bullet hole through the driver's side door near the handle, and the driver was non-responsive.

Chico was pronounced dead at the scene. The bullet passed through the driver's side door, entered Chico's left arm, and travelled through his body back to front and left to right, exiting his chest. The bullet pierced Chico's left lung and heart, causing his death.

LBPD officers reviewed surveillance footage from businesses near the restaurant, which showed Van's Mitsubishi and appellant's Mazda entering and leaving the parking lot, then making a U-turn, with the Mazda following the Mitsubishi. The police interviewed Van on March 22 and 25, 2018. Appellant was arrested in Fresno on March 28, 2018.

B.    *Appellant's interview*

LBPD detective Mark Mattia and his partner interviewed appellant following his arrest. The prosecution played the recording of appellant's interview for the jury. Appellant told the detectives that he had been "seeing" Van for a few months, once or twice a month, but she was not his girlfriend. At first, appellant said he did not know anything about the victim until after the shooting, but that Chico "didn't deserve it." Shown

5

photos of the Mazda, appellant acknowledged that he had driven the vehicle before, but that it was registered to his friend.

Appellant then admitted that he shot Chico. He continued: "It was an accident ya'll, you know, it was dude pull over man. This girl is—give her car back. All right. He stole the car. I'm like, hey, I'm tired of you, you know what I'm saying?" Appellant stated that Van was his friend but that Chico "didn't deserve it." Appellant said he never should have picked up the phone when Van called that night asking for help. According to appellant, Van had a "crazy" ex-boyfriend Konhu, with whom he used to be friends. That night, Van told him that she needed help and that Konhu had stolen her car, so he agreed to come pick her up.

Appellant claimed that he was trying to get Chico to pull over and give the car back to Van, but Chico would not pull over. Appellant heard Chico say, "I'm going to go home," but appellant continued to tell him to pull over. Van was saying, "Don't shoot." Appellant stated that he was just trying to fire a "warning shot." He did not intend to kill Chico and told the detectives that it was a "senseless murder."

After appellant fired his gun, he saw the car veer off the road, and he "took off on the freeway." He learned what had happened a few days later. Appellant told the detectives that he dismantled and buried the gun. When the detectives later reviewed the recording of the end of the interview, they discovered appellant also said, "I should have killed her ass man."

## II. *Defense Evidence*

Appellant testified that shortly after midnight on February 23, 2018, he received a phone call from his girlfriend, Van. She said that "her car was stolen" by her ex-boyfriend, Konhu, and

6

asked appellant to pick her up.  She said that Konhu took the car "forcefully against her will."  When asked for more detail at trial, appellant testified that Van told him that Konhu came and took her car while she was working.  Appellant was high on methamphetamine but went to the restaurant to pick Van up. When Van got into his car, he asked her how she got to the restaurant if her car had been stolen.  He felt she was not being honest about the situation, that "she was hiding something.  A lot of lies."

As Van and appellant were talking in the restaurant parking lot, he saw Van's car drive by, so he told Van they were "going to go get your car" and drove after the car.  Van told him to "just leave it alone."  Appellant drove after Van's car while Van crouched down on the floorboard.  Appellant said there was "a lot of chaos in the car, yelling back and forth," with Van telling him to "leave it alone."  After making a U-turn to continue following Van's car, appellant pulled out a loaded gun he kept under the seat of the vehicle.

Right before he fired, appellant and Van "had a little tussle" in which Van grabbed his arm near his elbow.  Afterward, he said, "What are you doing?  You could have got yourself hurt. I could have hurt you."  Appellant fired one shot.  He testified that he was not aiming at Chico and did not mean to shoot at the car.  However, during cross-examination, appellant admitted that he pointed the gun out the passenger window, toward where Chico was driving the other car one lane over.  When asked to describe what he was thinking at the moment he shot, he testified:  "Just a lot going on at the moment.  You know, being informed that it was her ex Sina that was driving, that stole the car, and just – I guess overprotective of her and –."  He was also

7

thinking that what he was doing was dangerous. When defense counsel asked if he disregarded that danger, appellant said: "I had control over my finger, but . . . I didn't aim at the car. I didn't intend for it to hit the car." He claimed that he wasn't thinking at the time that it could have killed Chico, he "wasn't thinking at all" because of the "heat of the moment." During cross-examination, appellant agreed that he knew when he fired that he could hurt someone. However, he later testified that he had that knowledge at the time of trial, but at the time he fired, "I wasn't thinking. I was reacting with feelings."

Appellant admitted that he had been convicted of a prior felony of carrying a concealed weapon and four prior felonies between 2008 and 2016 of being a felon in possession of a firearm. He had owned four other guns prior to the gun used in the shooting, had experience firing them at a range, and knew how the guns worked. Appellant also admitted that he lied to the detectives about burying the gun; instead, he sold the gun about a week after the shooting.

## DISCUSSION

Appellant contends the trial court erred in refusing his request to instruct the jury on involuntary manslaughter, because there was substantial evidence that he acted without conscious disregard for human life. We disagree.

### I. *Background*

At trial, the prosecution argued a theory of implied malice to support the murder charge. During the jury instruction conference, the court indicated it intended to instruct the jury on second degree murder and on the lesser included offense of voluntary manslaughter. Defense counsel requested that the court also include CALCRIM No. 580 on involuntary

8

manslaughter and the prosecution objected. Defense counsel argued that appellant "repeatedly said he did not intend to kill Mr. Chico," and that the instruction would apply because appellant did not have the intent to kill or conscious disregard for human life. The court noted that the act of shooting a gun from a vehicle in the direction of another vehicle was an inherently dangerous felony and that there were no other underlying crimes that appellant could have committed that were not inherently dangerous felonies. Defense argued that "the difference between this instruction and the instruction for second-degree murder is the requirement for conscious disregard for human life," and that "there are so many other things that were going on in that car when he fired that shot that his attention was divided . . . that very well he could have not appreciated the dangerousness of what he was doing." The court took the issue under submission.

Later, the court indicated it was "still on the fence" and would wait until after appellant's testimony "to decide whether there's sufficient evidence for that instruction to be given." After appellant testified, the court ruled that it was not going to give the instruction. The court reasoned: "I don't think there's any evidence to support giving 580 . . . particularly after the defendant's testimony."

## II. *Standard of Review*

The trial court has an obligation to instruct on a lesser included offense if substantial evidence would support a jury verdict that the defendant was guilty only of the lesser included offense and not the greater offense. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196; *People v. Romero* (2008) 44 Cal.4th 386, 402-403.) Substantial evidence is evidence from which a jury of reasonable people could conclude that the lesser offense, but not

9

the greater, was committed.  (*People v. Romero*, *supra*, 44 Cal.4th at p. 403; *People v. Breverman* (1998) 19 Cal.4th 142, 162.)  "Even evidence that is unconvincing or subject to justifiable suspicion may constitute substantial evidence and may trigger the lesser-included-offense requirement."  (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 792 (*Vasquez*).)  Yet substantial evidence is not synonymous with "'*any* evidence, no matter how weak'" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162); "[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.'"  (*People v. Simon* (2016) 1 Cal.5th 98, 132.)

We review the trial court's failure to instruct on a lesser included offense de novo.  (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*); *Vasquez*, *supra*, 30 Cal.App.5th at p. 793.)  In doing so, we consider the evidence in the light most favorable to appellant.  (*Brothers*, *supra*, 236 Cal.App.4th at p. 30.)  We do not evaluate witness credibility, and we resolve "uncertainty about whether the evidence is sufficient to warrant instructions" in appellant's favor.  (*Vasquez*, *supra*, 30 Cal.App.5th at p. 792.)

## III.   *Legal Principles*

Appellant was charged with murder, the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  "Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." *People v. Knoller* (2007) 41 Cal.4th 139, 151.)  Malice may be express or implied.  (§ 188.)  Malice is express "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature."

10

(§ 188, subd. (a)(1).) It is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) Courts have interpreted this language to mean that implied malice has both a physical and a mental component. A defendant accomplishes the physical component by performing an act, the natural consequences of which are dangerous to life. He satisfies the mental component if he knows that the conduct endangers the life of another and acts with conscious disregard for life. (*People v. Soto* (2018) 4 Cal.5th 968, 974.) Thus, "implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller, supra,* 41 Cal.4th at p. 143.)

Manslaughter is "'the unlawful killing of a human being without malice.'" (§ 192.) "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.]" (*People v. Blakely* (2000) 23 Cal.4th 82, 87-88.) Thus, "[w]hen a homicide, committed with malice, is accomplished in the heat of passion or under the good faith but unreasonable belief that deadly force is required to defend oneself from imminent harm, the malice element is 'negated' or, as some have described, 'mitigated'; and the resulting crime is voluntary manslaughter, a lesser included offense of murder." (*Brothers, supra,* 236 Cal.App.4th at p. 30.)

In the lesser included offense of involuntary manslaughter, however, malice is entirely absent rather than negated (§ 192,

11

subd. (b)); the crime is one of "criminally negligent unlawful homicide." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.) "Accordingly, an instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant acted without conscious disregard for human life and did not form the intent to kill." (*Vasquez, supra*, 30 Cal.App.5th at p. 794.) Involuntary manslaughter is statutorily defined as a killing occurring during either: (1) the commission of an unlawful act not amounting to a felony, that is, a misdemeanor; or (2) the commission of a lawful act which might produce death, performed in an unlawful manner or without due caution and circumspection. (§ 192, subd. (b); *People v. Manriquez* (2005) 37 Cal.4th 547, 587; *People v. Butler* (2010) 187 Cal.App.4th 998, 1006–1007; *People v. Parras* (2007) 152 Cal.App.4th 219, 227.)

IV.     *Analysis*

Appellant contends there was substantial evidence to support a jury verdict of involuntary manslaughter and therefore the court should have instructed the jury on that theory. There is no dispute that appellant lacked the intent to kill, an element of express malice. Indeed, the prosecution relied only on the theory of implied malice at trial.

Appellant argues that the evidence that he thought Van's car had been stolen from her and he intended only to fire a "warning shot" would support a finding that he acted without conscious disregard for human life, or implied malice. We are not persuaded that there was substantial evidence to require an instruction on involuntary manslaughter. Appellant admitted that he intentionally fired his gun out of the window of his car in the direction of the car driven by Chico. He did not claim that he fired accidentally, nor was there any evidence to suggest as

12

much.  This conduct was inherently dangerous.  (See *People v. McNally* (2015) 236 Cal.App.4th 1419, 1425 ["It is settled that brandishing a loaded firearm at a person is an act dangerous to human life."]; *People v. Garcia* (2008) 162 Cal.App.4th 18, 22.)

Appellant also admitted that he knew his conduct was dangerous.  Although he claimed he did not intend to hit the car or Chico, he testified that he did not think about the danger because he was acting "in the heat of the moment."  The jury rejected this testimony when it convicted appellant of second degree murder instead of voluntary manslaughter.  "[T]he state of mind of a person who acts with conscious disregard for life [i.e., implied malice] is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'"  (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.)  Because appellant knowingly used inherently lethal force against Chico by driving next to Chico and firing a gun in his direction, there is no evidence to establish that he acted without a conscious disregard for human life.  (See *Brothers, supra*, 236 Cal.App.4th at p. 35; see also *People v. Garcia, supra*, 162 Cal.App.4th at p. 22 ["An unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter."]; *People v. Cook* (2006) 39 Cal.4th 566, 596 [no duty to instruct on involuntary manslaughter when the defendant, who did not intend to kill the victim, "savagely beat" victim to death].)

Appellant argues that his conduct could constitute involuntary manslaughter under section 192, subdivision (b)(2), as "the commission of a lawful act which might produce death, performed in an unlawful manner or without due caution and circumspection."  But his acts of shooting from a vehicle and shooting into an occupied vehicle are not lawful acts; they are

13

both felonies, of which he was convicted. (§§ 246, 26100.) Moreover, his contention that these "otherwise illegal" acts "may become legal" when done to stop the commission of a felony, such as a carjacking, is not supported by the cases he cites. (See *People v. Melendrez* (1900) 129 Cal. 549, 550-551 [evidence could support finding of manslaughter where the defendant mistook the victim for an assailant, pursued him, then fired after he believed the victim was about to shoot him]; *Franzen v. Shenk* (1923) 192 Cal. 572 [action to recover damages for malicious prosecution].)

Appellant further contends that his actions were lawful as justifiable homicide under section 197[4], because he was attempting to stop what he believed to be a carjacking or robbery in progress. But appellant's argument that he acted in Van's defense reflects a claim of *voluntary* manslaughter, which the jury rejected. (See *People v. Breverman*, *supra*, 19 Cal.4th at p. 154 [finding that evidence indicating a defendant's honest but unreasonable belief of the need to engage in self-defense or

---

[4] Section 197 provides in pertinent part that a killing is justifiable "when committed by any person in any of the following cases: [¶] 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or, [¶] . . . 3. When committed in the lawful defense of such person, . . . when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed."

defense of another requires a jury instruction on voluntary manslaughter].)

Moreover, there was no evidence from which a jury could find that appellant fired his gun in an attempt to protect anyone from harm. (See *People v. Hardin* (2000) 85 Cal.App.4th 625, 629–630 ["only that force which is necessary to repel an attack may be used in self-defense; . . . [and] deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury"]; *People v. Ceballos* (1974) 12 Cal.3d 470, 472 [rejecting application of section 197 where "the character and manner of the burglary [did] not reasonably create a fear of great bodily harm, [thus] there is no cause for exaction of human life, or for the use of deadly force"]; *People v. Piorkowski* (1974) 41 Cal.App.3d 324, 329 [finding justifiable homicide "only where the felony committed is one which threatens death or great bodily harm"].)

There was no evidence that appellant believed at the time Van had been the victim of a carjacking. Rather, he testified that she told him the vehicle was stolen. When appellant arrived at the parking lot, he said that Van told him to let the issue go. He did not claim that she was scared or hurt. When he saw Van's car nearby, appellant testified that he acted to follow it and then to force the driver to pull over in an attempt to reclaim the car, not because he needed to protect Van. Notably, Van was in *appellant's* car at the time, begging him to stop and not to shoot, while Chico tried to drive away, stating that he just wanted to go home.[5]

_____

[5]We also reject appellant's contention that he used deadly force *during* the ongoing commission of a purported robbery or

15

Under these circumstances, there is no evidence to support appellant's claim of justifiable homicide. The trial court accordingly did not err by refusing to provide an involuntary manslaughter instruction.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, ACTING P.J.                    CURREY, J.

---

carjacking. Appellant arrived and began to chase Van's car several minutes after the vehicle was purportedly taken from Van and driven out of the parking lot. As such, the commission of any supposed carjacking or robbery was complete. (See *People v. Gomez* (2008) 43 Cal.4th 249, 255 [robbery requires asportation and continues until the perpetrator has reached a place of temporary safety with the property]; *People v. Lopez* (2003) 31 Cal.4th 1051, 1060 (asportation element for carjacking requires "'[a]ny removal, however slight'" of the vehicle from another person].)