Filed 6/30/22  P. v. Martin CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076498 |
| v. | (Super.Ct.No. RIF1506112) |
| BRANDON WILLIE MARTIN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge.  Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Brandon Willie Martin guilty of three counts of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a))[1]; evading a peace officer (Veh. Code, § 2800.2); obstructing an executive officer (Pen. Code, § 69); striking a police dog (Pen. Code, § 600, subd. (a)); and unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)). The jury found true the allegations that defendant committed multiple murders (§ 190.2, subd. (a)(3)), and during the three murders, defendant personally used a deadly and dangerous weapon (§ 12022, subd. (b)). In the penalty phase of the trial, the jury fixed the penalty as life without the possibility of parole (LWOP), rather than death. The trial court sentenced defendant to prison for seven years, four months, plus three consecutive terms of LWOP.

Defendant raises five issues. First, defendant contends the trial court erred by denying his request to instruct the jury that defendant's mental disease or disorder could be considered when deciding whether defendant premeditated the killings or deliberated over the killings. (§ 28; CALCRIM No. 3428.) Second, defendant asserts the trial court erred by not sua sponte instructing on the lesser included offense of voluntary manslaughter. Third, defendant contends the prosecutor committed misconduct by misstating the law of premeditation and deliberation. Fourth, defendant asserts the foregoing three alleged errors were cumulatively prejudicial. Fifth, defendant asserts the sentencing minute order and abstract of judgment should be corrected to reflect the

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

trial court did not order the three LWOP sentences to be served consecutively. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

Defendant graduated from high school in Corona in 2010 or 2011. After high school, defendant played minor league baseball in Florida. Under his contract, defendant was to receive approximately $860,000 for playing baseball. Defendant played baseball for approximately three seasons from 2011 to 2013. Defendant tested positive for marijuana three times. The baseball team required that defendant attend a substance abuse treatment program, but defendant "didn't come in time," so the baseball team released him. Defendant spent all the money he was given.

In 2015, defendant was living at his parents' home in Corona (the House), and he changed "from a nice presentable person to someone that you could tell there was evil on his face, in his eyes." Defendant was prescribed medication for anger issues, but it is unclear if he was taking the medication. Defendant had verbal and physical altercations with his relatives. Defendant "tried to kill [his mother] a couple of times." There were fist-sized holes in the walls of a hallway in the House.

On September 15, 2015, defendant had a violent altercation. Later that day, after the altercation, defendant's father, brother, cousin, uncle, and other family members gathered at the House to support defendant's mother (Mother) while having defendant "arrested or hav[ing] him taken somewhere." Uncle's son (Cousin) had called the police.

3

City of Corona Police Officer Sandoval spoke with defendant. Defendant cooperated with the officer and did not appear to be under the influence of drugs or alcohol. Sandoval detained defendant for a psychological evaluation because Sandoval felt defendant needed to be kept "away from the family." (Welf. & Inst. Code, § 5150.) Such detentions can last for 72 hours.

The next day, September 16, 2015, Mother ordered an ADT home security system for the House. Electronic door locks that require a passcode are part of the ADT security system. Mother tasked Cousin with finding a drug and alcohol abuse treatment facility that defendant could go to after being released from his detention. Cousin sent Mother information about the Salvation Army drug and alcohol program.

The doctor at the facility where defendant was detained gave defendant medication for depression and told defendant that defendant's mother did not want defendant to live in the House. On September 17, 2015, defendant was released from the facility. Defendant "went straight to the bus stop." Defendant boarded a bus in Riverside at 2:25 p.m., and exited the bus, in Corona, at 3:02 p.m. Depending on the streets that one chose, it would take approximately 50 to 60 minutes to walk from the Corona bus stop to the House.

Barry Swanson (Swanson) installed ADT security systems. Defendant's father was Michael Martin (Father). Defendant's uncle was Rick Andersen (Uncle).

On September 17, 2015, Swanson was at the House installing the security system. That same day, Father, who was wheelchair-bound, was visited by an occupational therapist, who left the House at 3:40 p.m. Uncle was also at the House "to

4

make sure [Father] was okay and . . . also . . . to keep[] an eye out for [defendant]." Cousin called Uncle throughout the day on September 17, speaking to him approximately five times. The family planned to tell defendant that defendant had to enter a drug treatment program or leave the House. Cousin last spoke to Uncle "a few minutes after 4:00."

When defendant arrived at the House, he saw that a lock with a keypad had been installed on the front door. The front door was unlocked, and defendant entered the House. Defendant noticed Swanson's uniform and deduced that he was there changing the locks. Swanson called ADT to confirm the newly installed alarm panel was active. The recorded phone call lasted from 4:11 p.m. to 4:15 p.m. Background audio was picked-up during the conversation as follows:

"[ADT]: Where is the key pad [*sic*]?

"Swanson: In the hallway—a sounder key pad [*sic*]. Uh, no—no zone list, but I can p—pull it from Pulse.

"[Unidentified Man]: . . . fuck . . .

"[Unidentified Man]: . . . you can come . . .

"[Unidentified Man]: . . . the fuck . . . what the fuck . . . what the fuck? What the fuck?

"[Unidentified Man]: What are you doing? What are you doing?

"[Unidentified Man]: No! . . . oh, you want some more?

"[Unidentified Man]: Mom!

"[Unidentified Man]: Fuck. No more, no more.

5

"[Unidentified Man]: Fuck. . . . is dead.

"[ADT]: Okay, so one through eight, all panics and duress. Is that right? [Swanson]? [Swanson]? [Swanson], can you hear me?

"[Unidentified Man]: Don't make me . . . forget all the other stuff . . . so . . .

"[ADT]: ADT Field Support, this is Jeremy. May I help you—are you still on the line?

"[Unidentified Man]: Fuck.

"[ADT]: ADT Field Support, may I help you? This is ADT Field Support, may I help you? Is anyone on the line? ADT disconnecting for no response."

When defendant left the House, he drove away in Swanson's truck. Cousin called and texted Uncle five or six times around 4:30 p.m., but Uncle did not answer or respond, which was unusual. Cousin worried that Uncle and Father might be in danger because "[defendant] was just released from the hospital." Cousin left the City of Orange at approximately 4:30 p.m. and arrived in Corona at approximately 5:30 p.m. Cousin opened the unlocked front door and saw a man's body on the floor. Cousin called 911.

Corona Police Sergeant Gamache was the first officer to arrive at the House. Uncle was on the ground "in front of the rear slider," with "blood pooling around him." The sliding glass door was shattered from the inside. Uncle was taken to the hospital. Uncle died of his injuries on September 19, 2015. Uncle's cause of death was multiple blunt force injuries to his head.

Swanson's body was "just behind the kitchen table." Swanson died at the House. The cause of Swanson's death was blunt force injuries to his head.

There were bloody drag marks on the living room floor, continuing down a hallway to a door into the garage. Father's body was inside the garage, at the end of the blood trail. There was a pool of blood on the backside of Father's head. Father died at the House. The cause of Father's death was multiple blunt force injuries to his head.

A baseball bat was inside the House, leaning against the wall to the left of the doorway into the garage. The baseball bat was dented and bloody. Paint from the baseball bat matched paint on Father's skull.

Sergeant Gamache learned that Swanson drove a white 2012 Ford Raptor truck. Swanson's truck was not at the House, so Gamache "had [the] dispatch center put a felony stop on the vehicle," which means the truck was treated as stolen. Corona Police Detective Taylor looked at city video surveillance recordings for Swanson's truck. Taylor looked at the intersections closest to the House as of 4:15 p.m. on September 17 because that was when Swanson's phone call with ADT ended. Taylor saw a white Ford Raptor truck at an intersection at 4:44 p.m.

On September 18, 2015, at approximately 9:40 a.m., Corona Police Officer Velasco saw Swanson's truck. Velasco, who was wearing a police uniform and driving a marked police car, turned on the car's overhead lights. Defendant stopped the truck on a residential street. Velasco exited her patrol vehicle and stood behind the open driver's side door with her gun drawn. Another officer, in an unmarked vehicle, exited his car, and stood behind the open passenger door of his vehicle with his gun drawn.

7

Velasco used the car's speaker system to tell defendant "to put his hands outside the window," which defendant did. Within minutes, more police officers arrived.

Defendant brought his hands back inside the truck and drove away. Defendant did not stop at stop signs or red lights. Velasco followed defendant with the patrol car's overhead lights and siren on. Other officers also followed defendant. Velasco thrice used a pursuit intervention technique (PIT) maneuver, i.e., intentionally striking the truck with the patrol car, to stop the truck, but was unsuccessful. The fourth PIT maneuver caused the truck, which had been traveling westbound, to face north. Another officer then "rammed" the truck, and the truck stopped.

Defendant exited the truck and ran down the street. Defendant jumped over a fence into a backyard. Defendant entered a house in which a woman was showering. Defendant jumped out of a second-floor window into the backyard. Defendant landed on the ground, partially on concrete and partially on grass, where he lay motionless. An officer directed defendant, multiple times, to "show . . . his hands," but defendant did not respond, and the officers were unsure if defendant was conscious.

A police officer told defendant to show his hands or a police dog would bite defendant. Defendant did not respond. A police dog, Dex, was sent over to defendant. A police officer gave Dex the bite command, and Dex bit defendant's leg. Defendant stood up and punched Dex's head approximately 10 times. Defendant then picked up Dex and slammed him down headfirst onto the concrete. At that point, approximately four officers tackled defendant to the ground, but defendant kept his hands in his

8

waistband and kicked the officers. Eventually, the officers handcuffed defendant and the struggle ended. Defendant was taken to the hospital for injuries he sustained.

Corona Police Detective Gottfried interviewed defendant, at the jail, on September 22, 2015. During the interview, defendant said that when he was released from the facility following his Welfare and Institutions Code section 5150 hold, he went to the House to get his clothes. The front door was unlocked. Defendant saw Uncle and Swanson lying dead, in what appeared to be "a murder scene." Defendant "got a Dr. Pepper," and then saw Father's body. Defendant went upstairs to gather his belongings. Defendant took truck keys, a cell phone, a wallet, and a knife from Swanson's pocket. Defendant also took Father's and Uncle's cell phones. Defendant drove Swanson's truck to Carl's Jr. where he ate. Defendant went to a gas station where he threw away the three cell phones because he realized police could track his location through the phones "and then [defendant] would have been in trouble." Defendant attempted to use Swanson's credit card at the gas station, but the transaction was declined. Defendant threw away Swanson's wallet because he realized that he could also be tracked through his use of Swanson's credit cards. Defendant drove by the House because he wanted to take Uncle's truck, but police were at the House.

As defendant was driving Swanson's truck, a police officer stopped him. The officers pointed their guns at defendant, which scared defendant because "[t]hey had pulled [him] over for no reason." Defendant exited the truck and ran. Defendant hid in a backyard, entered an unlocked house in which a woman was in the shower, and then jumped out of a window of the house in a suicide attempt. Defendant attempted suicide

9

because he does not like the police or jail.  When defendant landed on the ground, a police dog bit his legs and groin.  Defendant wrestled the dog off of him, but the dog returned.  Police officers ultimately placed defendant in handcuffs.

Defendant then offered an alternate explanation for what occurred when he arrived at the House after leaving the facility where he was detained.  Defendant saw Uncle in the backyard talking on the telephone.  Defendant went to the driveway, in the front of the House and laid down on the cement.  After sleeping for approximately one hour, defendant entered the House and saw the three bodies.  However, defendant also said, "I saw what happened."

The detective asked defendant to discuss the baseball bat.  Defendant said, "I had seen blood on the sofa my dad was (Unintelligible) and blood by my hands."  The following exchange occurred:

"[Defendant]:  And some on my hands.

"[Detective]:  And some[]what on your hands?

Defendant]:  I even seen it on my hands when I picked up the baseball bat and left it on there.

"[Detective]:  Okay, so you saw blood on your hands when you picked up the baseball bat?

"[Defendant]:  I had left over blood, yeah.

"[Detective]:  Okay, where was the baseball bat at?

"[Defendant]:  It was in my room, and I made a few swings.

"[Detective]:  It was in your room, what?  Speak up, I can't hear you.

10

"[Defendant]:  Made a few swings from it and then I had left.

"[Detective]:  What do you mean you made a few swings from it?

"[Defendant]:  In my room.

"[Detective]:  What do you mean?  I don't understand.

"[Defendant]:  Like I grabbed the baseball bat and was holding it.

"[Detective]:  Right.

"[Defendant]:  Cause it was just right there and I was angry.

"[Detective]:  Right.

"[Defendant]:  I didn't know what to do.  Just hit a few things.

"[Detective]:  What did you hit?

"[Defendant]:  I just went—I just went crazy with it.  I hit a wall.

"[Detective]:  What wall?  In your bedroom that you hit?

"[Defendant]:  Sofa.  Pretty much."

Defendant said the blood on the bat was from Father, and he knew that because he touched Father's head to check if he was alive.  The detective pointed out that defendant had previously said that he took items from the men's bodies but did not check if they were alive.  Defendant replied he would not kill a person and that he did not remember murdering anyone.  The detective asked if defendant had "been diagnosed with anything," and defendant said, "No."  The detective asked why defendant took medication, and defendant explained, "I got mad at my brother."  Defendant said he took narcotic pain medication approximately two hours before the police interview.

11

At the trial, after the prosecution rested, defendant rested without putting on any evidence.

**DISCUSSION**

A.    CALCRIM No. 3428

1.    *PROCEDURAL HISTORY*

Defendant asked the trial court to instruct the jury that defendant's mental disease or disorder could be considered when deciding the elements of premeditation and deliberation.  (§ 28; CALCRIM No. 3428.)  The trial court asked, "What evidence do we have of mental impairment?"  Defense counsel cited the testimony of Officer Sandoval who detained defendant under Welfare and Institutions Code section 5150 and Cousin's testimony about defendant acting differently than he had in the past, e.g., defendant changed "from a nice presentable person to someone that you could tell there was evil on his face, in his eyes."  The prosecutor asserted that Cousin believed defendant needed substance abuse treatment and the officer detained defendant out of concern for defendant's family's safety, not due to a psychological diagnosis.  The prosecutor concluded, "There was no evidence of any psychological diagnosis . . . as it relates to [defendant]."

Defense counsel asserted that Welfare and Institutions Code section 5150 applies when the person is a danger to others due to a mental health disorder, so the evidence of Officer Sandoval detaining defendant would be sufficient for giving CALCRIM No. 3428.  The prosecutor asserted, "[T]here's no evidence that the defendant had any

12

mental health disorder at all. . . . He was detained by the opinion of the officer for a 5150 hold."

The trial court concluded that Officer Sandoval detained defendant as a means of protecting defendant's family. The court then remarked, "I just don't know if there's substantial evidence to support giving . . . the instruction when there's no evidence that the defendant had any such disorder. [¶] . . . I'm going to refuse it. I just don't think there's substantial evidence to support the giving of the instruction, given the state of the evidence."

2.    *ANALYSIS*

Defendant contends the trial court erred by denying his request for the jury to be instructed with CALCRIM No. 3428 because evidence of defendant's mental disease or disorder should have been considered by the jury when deciding the elements of premeditation and deliberation.

Section 28, subdivision (a), provides, "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Section 28, subdivision (b), provides: "As a matter of public

13

policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing."

A defendant may "produce lay or expert testimony to rebut the prosecution's showing of the required mental state." (*People v. Mills* (2012) 55 Cal.4th 663, 672, fn. omitted.) "Thus, for example, '[a]n expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence [or non-existence] of the mental states of premeditation and deliberation.' " (*People v. Nieves* (2021) 11 Cal.5th 404, 441.) So, for instance, an expert could testify that a "defendant entered a dissociated state," and the testify about the condition's "physiological basis, its psychosocial basis, and its behavioral manifestations, . . . and [that it] can cause the person to act without conscious volition." (*People v. Cortes* (2011) 192 Cal.App.4th 873, 911.) CALCRIM No. 3428 sets forth the foregoing law.[2]

---

[2] CALCRIM No. 3428 provides, "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime.
"The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically: _____<insert specific intent or mental state required, e.g., 'malice aforethought,' 'the intent to permanently deprive the owner of his or her property,' or 'knowledge that . . .'>. If the People have not met this burden, you must find the defendant not guilty of _____ <insert name of alleged offense>.
"<Repeat this paragraph for each offense requiring specific intent or a specific mental state.>
"[Do not consider evidence of mental (disease[,]/ [or] defect[,]/ [or] disorder) when deciding if _____ <insert name of nontarget offense> was a natural and probable consequence of _____ <insert name of target offense>.]"

14

When determining whether the trial court erred by refusing a requested instruction, we apply the de novo standard of review. (*People v. Brugman* (2021) 62 Cal.App.5th 608, 622, fn. 3.) There is evidence of defendant suffering mental distress. Defendant may have been given medication for anger issues, and he may not have been taking that medication. Defendant was detained under Welfare and Institutions Code section 5150. During that detainment, defendant was given medication for depression. When defendant was trying to evade the police, he jumped out of a second story window because he felt suicidal.

Although one could conclude that defendant was in mental distress, there was nothing indicating that the distress would have affected defendant's premeditation or deliberation. For example, there is no evidence that defendant's depression or anger caused dissociative states and that such states prevent people from deliberating. (See *People v. Cortes*, *supra*, 192 Cal.App.4th at pp. 909-911.) Because there is no evidence indicating that defendant's mental distress may have negated any actual deliberation and premeditation, the trial court properly refused to instruct with CALCRIM No. 3428.

Defendant asserts the trial court's denial of his request for CALCRIM No. 3428 violated his constitutional rights of due process and to present a defense. There is "no authority creating a constitutional right to have the jury instructed on theories unsupported by evidence." (*People v. Ayala* (2000) 23 Cal.4th 225, 283} As explained *ante*, the evidence did not support instructing the jury with CALCRIM No. 3428. Thus, defendant's constitutional rights were not violated by the trial court denying defendant's request for CALCRIM No. 3428.

B.   VOLUNTARY MANSLAUGHTER

1.   *PROCEDURAL HISTORY*

Before defendant was released from the Welfare and Institutions Code section 5150 facility, the doctor at the facility told defendant that defendant's mother did not want defendant to live at the House.  Defendant said he went to the House on September 17, 2015, to gather his belongings and move out.

Defendant's bus ride to Corona lasted 37 minutes.  The walk from the Corona bus stop to the House lasted 50 to 60 minutes.  The family planned to tell defendant that he had to enter a drug treatment program or leave the House.  In regard to that ultimatum, Cousin testified as follows:

"[Prosecutor]:  On the 17th of September when you spoke to [Uncle], any one of those times do you remember, did you express to [Uncle] the Salvation Army drug abuse treatment program, that [defendant] should go into it?

"[Cousin]:  Yes, I did.

"[Prosecutor]:  Okay.  And when you spoke to [Uncle], did he tell you whether [defendant] had come home?

"[Cousin]:  Yes, he did."

"[Prosecutor]:  And did [Uncle] tell you whether he expressed to [defendant] about some sort of ultimatum?"

"[Cousin]: Yes, he did."**3**

"[Prosecutor]: [S]o the ultimatum was enter this drug and alcohol rehab program or leave the house?

"[Cousin]: Yes, sir."

2.      *ANALYSIS*

Defendant contends the trial court erred by not sua sponte instructing on the lesser included offense of heat of passion voluntary manslaughter.  (§ 192, subd. (a); CALCRIM No. 570.)

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."  [Citation.]  That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.  [Citations.]  The obligation to instruct on lesser included offenses exists even when as a

---

**3** The People correctly note that one cannot determine from the record if Uncle gave defendant the ultimatum due to the way the prosecutor worded his questions.  The prosecutor asked if Uncle told Cousin "*whether* [Uncle] expressed to [defendant] about some sort of ultimatum."  (Italics added.)  Cousin replied, "Yes, he did."  From that line of questioning, we can only determine that Uncle discussed whether he did or did not deliver the ultimatum.

17

matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155.)

Thus, in a murder case, the court has a sua sponte duty to instruct on voluntary manslaughter if there is "substantial evidentiary support" for that theory of the killing. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 160.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Id.* at p. 162.) "We review de novo the trial court's failure or refusal to instruct on a lesser-included offense." (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 793.)

Voluntary manslaughter "is the unlawful killing of a human being" "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " . . . The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [¶] . . . ' "However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter." ' " (*People v. Moye* (2009) 47 Cal.4th 537, 549-550.)

The record indicates that defendant was told by the doctor at the facility that defendant's mother no longer wanted defendant to live at the House. As a result,

18

defendant intended to move out of the House. Defendant's trip to the House took approximately 90 minutes. When defendant arrived at the House, he saw the locks had been changed. Additionally, Uncle may have told defendant that defendant needed to move out or enter a drug rehabilitation facility.

A reasonable person would not react without reflection after being told that he needed to move out of his parents' house. However, to the extent a person might act rashly after receiving such news, 90 minutes is sufficient time for such passion to subside. Further, if a reasonable person arrived at their parents' house and saw the locks were changed, a reasonable person might be upset that such measures were being taken, but it is not the type of provocation that would cause a reasonable person to react without reflection. Moreover, if an ultimatum to move out or attend substance abuse treatment were made, that too would not cause a rational person to act without due deliberation particularly when a doctor had previously provided similar information about having to move out. Accordingly, the trial court did not have a sua sponte obligation to instruct the jury on voluntary manslaughter because the provocation was not the type that would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.

Defendant asserts that his family had him hospitalized, told him to move out of the House, and changed the locks. Defendant asserts those events would provoke a reasonable person to act rashly. Heat of passion can arise from a " 'series of events over a considerable period of time.' " (*People v. Berry* (1976) 18 Cal.3d 509, 515.) If the acts listed by defendant are aggregated and if there had been no reasonable basis for

19

those acts, then perhaps a person might react with passion due to a perceived injustice of being detained and told leave their home. However, defendant had a history of violent behavior with his mother.

On the day defendant was detained under Welfare and Institutions Code section 5150, he had a violent episode. If a reasonable person had a violent episode, was detained, was told to move out, and noticed that the locks were changed, then the reasonable person would understand that those were the consequences of violent behavior. A reasonable person would not respond with such passion that he acted without judgment. (See *People v. Beltran* (2013) 56 Cal.4th 935, 953 ["react from that passion and not from judgment"].) In other words, defendant was violent, and his family reacted to defendant's violence by protecting themselves. A reasonable person would not respond to such protective measures without reflection.

Defendant contends the failure to instruct sua sponte on voluntary manslaughter violated his federal constitutional rights to a jury trial and due process. "Defendants have a constitutional right to have the jury determine every material issue presented by the evidence, and a trial court's failure to instruct on lesser included offenses denies them that right." (*People v. Cash* (2002) 28 Cal.4th 703, 736.) As explained *ante*, a voluntary manslaughter instruction was not supported by the record because there was no evidence that a reasonable person would have responded to the alleged provocation without reflection and due deliberation. Because there was no evidence to support a voluntary manslaughter instruction, defendant's constitutional rights were not violated.

## C. PROSECUTORIAL MISCONDUCT

### 1. *PROCEDURAL HISTORY*

During closing argument, the prosecutor said, "[Defense counsel] stated that it doesn't appear that [defendant] has the ability to reflect, basically, the ability to deliberate, to make a careful consideration, to weigh the consequences. So I'd like to talk about that. And he mentioned that he sounded like an eight- to a ten-year-old in that interview. The evidence is for you to consider. So if you think that he sounded like an eight- to ten-year old, then I've got nothing for that. But the evidence is the evidence.

"But I will tell you this: That as young as [defendant] was in 2015, 22 years of age, as we learned, what was he able to do before that? He signed an $860,000 contract. I don't know about you, but that sounds like a lot of money, and I think it still is a lot of money today. An $860,000 contract to play professional baseball.

"Now, what's important about that? There's a couple things. One, well, he was able to do that just fine. He was able to get that money and actually blow through it in a few years. Okay? But he can't be able to be found guilty of murder because he cannot have the ability to really consider or weigh his decision-making?

"All right. Well, what about the fact that he's a professional baseball player? What do professional baseball players have to do when they're at bat, when that 90-mile-per-hour ball comes barre[ling] down to the plate? They have literally a split second to decide whether they're going to swing or not swing. This is a professional athlete whose job is to deliberate, to make decisions.

21

"Now, think of it this way: When [defendant] comes to the house, he has to make that decision to pick up the baseball bat. And what are the reasons why you're going to use a baseball bat? Either to play baseball or hurt somebody. So he picks up that baseball bat, goes over to [Uncle] and, by surprise, crushes the back of his skull. That takes a lot of deliberation in that you have to consider that you're picking up that bat and you're going to swing it at the most vulnerable place on a human body. He didn't hit him in the back. He didn't hit him in the stomach. He didn't hit him in the legs or the arms. He hit him in the back of his skull.

"And then, as [Uncle] fell, now either on the ground or near the ground, over and over again to the most vulnerable place on a human body, to their head. So assuming that—let's give him that first hit . . . . Let's give him that, that that was a rush decision. It wasn't cold and calculated. Okay? What about the additional blows after blow after blow? Not just to the back of the head, but to his throat, and the pain that would have caused [Uncle] as his hyoid broke. His own uncle. So even if we give him that first strike, not deliberating at that or premeditation, each and every blow to the most vulnerable part of the human body is."

### 2.     *ANALYSIS*

#### a.      Forfeiture

Defendant contends the prosecutor committed misconduct by "comparing the elements of premeditation and deliberation to the decision to swing at a pitch in baseball." Defendant contends that the distance from the pitcher to the batter, combined with a ball traveling 90 miles per hour, means that a batter "has to make the decision of

22

whether to swing in about *a quarter of a second*." Defendant asserts that the jury likely understood the prosecutor's argument as asserting "that, since [defendant] must have thought about it for at least a split second, he must have acted with the premeditation and deliberation necessary for first degree murder." Defendant asserts such an understanding would be incorrect because "[p]remeditation and deliberation requires substantial pre-existing reflection."

The People contend defendant forfeited this issue by failing to object in the trial court. " ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 426.) We conclude defendant forfeited this issue by failing to object in the trial court.

### b.    Ineffective Assistance

Defendant contends that, if the issue was forfeited, then his trial counsel was ineffective for failing to object.

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored. [Citation.]

23

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)

"In the context of first degree murder, premeditation means ' "considered beforehand" ' [citation] and deliberation means a ' "careful weighing of considerations in forming a course of action . . . ." ' [Citation.] 'The process of premeditation and deliberation does not require any extended period of time.' [Citation.] ' "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10.)

24

The prosecutor did not argue that the deliberation required for first degree murder was the same deliberation required for playing baseball. Rather, the prosecutor argued that defendant was capable of making quick decisions.

The prosecutor asserted, "Well, what about the fact that he's a professional baseball player? What do professional baseball players have to do when they're at bat, when that 90-mile-per-hour ball comes barre[ling] down to the plate? They have literally a split second to decide whether they're going to swing or not swing. This is a professional athlete whose job is to deliberate, to make decisions." The prosecutor's argument was focused on defendant and his ability to make decisions—not the law of deliberation. Given that the prosecutor was not discussing the law, it was within the wide range of professional competence for defendant's trial counsel to not object. Accordingly, defense counsel's performance did not fall below an objective standard of reasonableness.

Moreover, even if we were to conclude trial counsel erred by not objecting, the error would not be prejudicial because the jury was given correct instructions on premeditation and deliberation. The jury was informed, "The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A

25

decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of reflection, not the length of time." (CALCRIM No. 521}

Thus, the jury was informed that there had to be evidence of reflection and a careful weighing of "the considerations for and against" killing. To the extent the jury thought that the prosecutor was using the story of playing baseball to describe the legal requirement for deliberation in a first degree murder case, the instruction clarified the legal requirements, e.g., careful consideration and reflection. Therefore, prejudice has not been demonstrated.

### D.    CUMULATIVE ERROR

Defendant contends that when the prejudice from the foregoing three alleged errors is amassed, it requires the judgment to be reversed. We have not found any errors. As a result, there is no prejudice to cumulate. (*People v. Duff* (2014) 58 Cal.4th 527, 562.)

### E.    CONSECUTIVE LWOP TERMS

#### 1.    *PROCEDURAL HISTORY*

The three murders comprised Counts 1, 2, and 3. When sentencing defendant, the trial court said, "At this time the Court will sentence the defendant on Count[s] 1, 2, and 3 to life without the possibility of parole. As to each of those counts attached is Penal Code [section] 12022(b)(1), which is for the weapon that was utilized. As to each count, the Court will impose one year consecutive to one another for a total determinate

26

term in those three counts of three years in state prison." When the trial court pronounced defendant's total sentence, it said, ". . . making the total determinate term seven years and four months with three life-without-the possibility-of-parole sentences."

2.    *ANALYSIS*

Defendant contends the sentencing minute order and abstract of judgment should be corrected to reflect the trial court did not order the three LWOP terms to be served consecutively.

"The procedure for sentencing a person convicted of two or more felonies does not contemplate imposing an enhancement separately from the underlying crime." (*People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1310.) Therefore, the substantive offense and the enhancement, together, are ordered to be served either consecutive to or concurrent with a prison term from another count. (*Id.* at p. 1311 [imposing a concurrent term for the substantive offense and a consecutive term for the related enhancement is an unauthorized sentence].)

In the instant case, the trial court ordered that the three one-year sentences for the weapon enhancements (§ 12022, subd. (b)(1)) in Counts 1 through 3 be served consecutively. Because the substantive offense and the enhancement cannot be separated, by ordering the enhancement sentences to be served consecutively, the trial court impliedly ordered the LWOP terms for the murders to be served consecutively. That implied sentence is confirmed by the trial court's statement about "three life-without-the possibility-of-parole sentences," when stating the total sentence. If the trial court had intended to have the LWOP terms served concurrently, then it would have

27

said "one LWOP term," rather than three LWOP terms.  Accordingly, we conclude the sentencing minute order and abstract of judgment do not require correction.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                J.

We concur:

RAMIREZ
                        P. J.

CODRINGTON
                        J.