Filed 6/18/25  P. v. Colston CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>BRYAN T. COLSTON,<br><br>     Defendant and Appellant. | A169445<br><br>(Alameda County<br>Super. Ct. No. 19-CR-017901A) |

Defendant Bryan Colston was charged with murder and other felonies after he shot and killed Bomani Busby in an Oakland parking lot. Surveillance footage from a nearby building showed Brandon Harper, a friend of Colston's, assaulting Busby in Busby's car immediately before the shooting.  Colston testified that he shot Busby only after Busby grabbed a gun from the car's backseat, but a jury rejected the defense theory that Colston killed in self-defense or defense of another and convicted him of first degree murder, shooting at an occupied vehicle, and being a felon in possession of a firearm.  The trial court sentenced him to 25 years to life in prison.

On appeal, Colston claims the trial court erred by (1) failing to instruct fully on defense of another; (2) instructing on the custodial status of Harper, who testified for the defense; and (3) imposing two assessments and a

restitution fine absent evidence of Colston's ability to pay them. We reject these claims and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.    *The Murder*

Colston was 30 years old at the time of the shooting on October 9, 2019. That night, he was armed with a loaded .22 caliber handgun that did not have a safety. Colston admitted he had a prior felony conviction and knew he was not supposed to possess guns, but he "fe[lt] the need to keep a firearm" to protect himself in Oakland.

Colston and Harper were close childhood friends.[1] Colston did not know Busby, but Harper had known him for a few years. Harper testified that some weeks before the murder, Busby stole clothing from him. According to Harper, the two "had issues," but Harper was not actively looking to confront Busby over the theft.

Earlier on October 9, Harper and Colston were in Harper's room at an Oakland hotel. Harper's pregnant girlfriend came to the room, upset and crying. Harper testified that she said Busby had "threatened her and roughed her up a little bit," and she also reported that Busby "was threatening that he was gonna do something to [Harper] when he [saw Harper]." According to Colston, Harper's girlfriend said Busby held a gun to her head and then indicated he was "sparing her" to "go[] after" Harper instead. Harper testified that he was "outraged," and he told his girlfriend he

---

[1] Harper was originally charged with murder for his role in the killing, and the jury was told that he entered a plea to "manslaughter." He testified that his plea agreement required him to testify truthfully at Colston's trial. During his testimony, Harper admitted telling numerous lies to the police when first interrogated.

2

was going to look for Busby and "beat him up." Colston thought Busby was in the wrong but was not inclined to get involved.

That evening, Colston drove Harper and a female friend, F.H., in a gray Infiniti to a recycling center on 77th Avenue. Harper testified that they went to the center, which was next to a homeless encampment, so he could buy heroin. When they arrived, Harper noticed Busby's car, a green Subaru, was parked there. Harper testified that because it was dark outside, he could not see whether anyone was in the Subaru.

Soon afterward, Derrick Simmons-King and Joshua Lucas arrived at the recycling center in Simmons-King's gray Nissan.[2] Simmons-King and Lucas both knew Harper and Colston, but only Simmons-King knew Busby. Lucas got out of the car and approached Harper, who was standing by the Infiniti. Harper told Lucas he had "a problem" with Busby, who was in a car nearby. Harper asked Lucas to come with him "so we can holler at this dude right here." Lucas testified that Harper was high on drugs, and he seemed "jittery" but not angry.

Harper and Lucas then got into the Infiniti with Colston and F.H. At Harper's direction, Colston drove over to Busby's Subaru. Surveillance footage from the recycling center was introduced into evidence. The footage, which does not have sound, showed the Subaru parked against a building wall, facing out, and the Infiniti pulled perpendicularly in front of it. The recording shows the Subaru had enough room to leave, and Colston denied trying to block it in.

---

[2] Simmons-King entered a plea to accessory after the fact and testified for the prosecution, and Lucas entered a plea to voluntary manslaughter and testified for the defense. The jury was not informed of Simmons-King's plea, but it was told that Lucas made "a deal" with the prosecution that required him to testify truthfully.

Harper, Lucas, and Colston exited the Infiniti and approached the Subaru's driver's side. As the surveillance footage confirms, Colston admitted he pulled out his gun "almost as soon as [he] got out of the car." He testified that he did so because he thought "Busby might have a weapon on him," given Harper's girlfriend's report that Busby threatened her with a gun, and he "wanted to . . . make sure nothing happened."

Harper opened the Subaru's driver's door, revealing Busby reclined in the driver's seat. Busby's girlfriend was in the front passenger's seat. According to Harper, Busby was "sleeping or half asleep." Harper grabbed Busby's legs and attempted to pull Busby out of the Subaru. Harper testified that Busby, whose legs were now outside the car, resisted and kicked at him, and he punched Busby "once or twice."

Lucas, who had a knife, testified that he then stabbed Busby in the leg "to get his attention." Busby called to Simmons-King for help, and Simmons-King ran over to the Subaru. A few seconds later, F.H. got out of the Infiniti and went to stand by the Subaru, behind Colton.

There was conflicting evidence about what happened right before Colston shot Busby. Colston testified that he heard Harper say, "Why are you reaching? What are you reaching for?" Colston interpreted this to mean that Busby was reaching for a gun. Colston then saw Busby reach behind the front passenger's seat and retrieve a gun. Busby's girlfriend, however, testified that Busby did not try to reach for anything while Harper was beating him.

Lucas testified that Harper said, "What you reaching for?," and claimed that it appeared as if Busby "was reaching for something" in the Subaru's backseat. When Lucas initially spoke to the police, however, he did not mention seeing Busby reach for something or hearing Harper say anything

4

about "reaching," and he did not admit to stabbing Busby. Lucas also agreed that he reported Harper's statement only after the police suggested Lucas might have stabbed Busby in self-defense. Similarly, Simmons-King claimed for the first time at trial that he heard Harper say Busby "was reaching," a statement he never mentioned to the police or at the preliminary hearing.

Harper testified that it was Lucas or Colston, not he, who initially said, "He's reaching, he's reaching." Harper testified that he then said, "What you reaching for?" He claimed he saw Busby reaching for something underneath the driver's seat but did not "actually see" a gun. When asked whether he was "in fear" based on Busby's action, Harper responded, "Sorta kinda, yeah. [¶] . . . [¶] I wondered, you know, what are you reaching for? Like, I'm not expecting all this. So now I'm on . . . guard."

Colston testified that after he saw a gun in Busby's hand, he told Harper to move. Similarly, Harper and Lucas testified that after the statements about "reaching" were made, Colston repeated "move" several times. The surveillance recording shows Colston, who was standing behind Harper, talking and possibly repeating the word "move" while holding a gun in his right hand. Colston then tapped Harper with his left arm and gestured for the other man to get out of the way before raising the gun and firing numerous shots at Busby.

Colston, Harper, and Lucas uniformly denied that there was any preexisting plan to meet at the recycling center and attack or kill Busby. According to Colston, he shot Busby because he feared for his life and "the life of everybody" else clustered around the Subaru, including Harper, Lucas, and F.H. Colston believed that if he did not shoot Busby, Busby would shoot him and his friends. Colston testified that he felt "real bad" about killing Busby and "wish[ed he] could bring [Busby] back."

5

## B.    *The Aftermath*

At 10:35 p.m., Oakland police officers were dispatched to the recycling center in response to a reported shooting.  Busby's girlfriend was standing next to the Subaru, crying, and Busby was facedown on the ground.  Busby's girlfriend told one of the officers that "three or four" people opened the car's door and shot Busby, and she tied them to the hotel where Harper was staying.

Eight .22-caliber shell casings were recovered from the scene.  A replica rifle was immediately located sticking out from under several items in the Subaru's backseat, which was "overflow[ing] with bags of personal items and belongings."  When the Subaru was later processed more thoroughly, the police also found a replica gun on the floorboard by the driver's seat, near the center console.  This gun was not found until the driver's seat was moved back.

An autopsy showed that Busby was shot at least seven times and had a stab wound toward the back of his left thigh.  The bullets hit several organs, including his heart and liver.  His cause of death was multiple gunshot wounds, with the stab wound as a contributing factor.  His blood contained methamphetamine and cocaine, both stimulants, and heroin, a depressant.

Immediately after the shooting, Simmons-King and Lucas left the scene in the Nissan, and Colston, Harper, and F.H. fled in the Infiniti to Harper's hotel.  Surveillance footage from the hotel's parking lot was also introduced into evidence.  The footage showed that after parking, Colston put something in a red backpack before exiting the Infiniti.  Carrying the red backpack, he and Harper made a few trips between the Infiniti and the hotel.

Within minutes, Colston and Harper left the hotel in a different car with another female acquaintance.  On his way to the other car, Colston, who

6

no longer had the red backpack, gave the Infiniti's keys to F.H. She immediately drove away in that vehicle.[3]

Later surveillance footage showed another man in the hotel's parking lot holding a red backpack, which he hid when the police eventually arrived. At trial, Colston denied putting his gun in the backpack or giving the backpack to the other man. Colston claimed he left the backpack in Harper's hotel room but kept the gun, eventually selling it to a friend of a friend. For his part, Harper denied knowing what happened to Colston's gun, which was never recovered.

### C.     *Procedural History*

Colston was charged with felony counts of murder, shooting at an occupied vehicle, being a felon in possession of a firearm, and unlawfully carrying a loaded firearm.[4] Various enhancements were also alleged, primarily firearm enhancements in connection with the first two counts. Shortly before trial, on the People's motion, the trial court dismissed the enhancements attached to the first two counts and the charge of unlawfully carrying a loaded firearm.

The jury convicted Colston of first degree murder and the remaining two counts. In December 2023, after denying Colston's motion for a new trial, the trial court sentenced him to 25 years to life in prison. The sentence

---

[3] The Infiniti belonged to another friend of Colston's who had lent it to Colston. After the murder, Colston told the friend he had been carjacked, and she reported the vehicle stolen. The Oakland police soon found the Infiniti in the possession of a friend of Harper and Lucas's, whom Colston claimed stole it from him.

[4] The charges were brought under Penal Code sections 187, subdivision (a) (murder), 246 (shooting at occupied vehicle), 29800, subdivision (a)(1) (being felon in possession), and section 25850, subdivision (a) (carrying loaded firearm). All further statutory references are to the Penal Code unless otherwise noted.

was composed of a term of 25 years to life for the murder and concurrent terms of five years, the midterm, for shooting at an occupied vehicle and two years, the midterm, for being a felon in possession of a firearm. The court also imposed a $10,000 restitution fine, a $120 court operations assessment, and a $90 conviction assessment.

## II.
### DISCUSSION

*A.     No Instructional Error Related to Defense of Another Occurred.*

Colston claims the self-defense instructions given for the murder charge and the charge of shooting at an occupied vehicle omitted language about defense of another, permitting the jury to convict even if it found he "honestly believed in the need to protect Harper." We conclude that no error occurred.

### 1.     Additional facts

As to the murder, the trial court instructed the jury on perfect self-defense under CALCRIM No. 505 and imperfect self-defense under CALCRIM No. 571. The court also instructed the jury on self-defense as a defense to the charge of shooting at an occupied vehicle under CALCRIM No. 3470. During the conference on jury instructions, the court agreed with Colston that all three instructions should include the optional bracketed language about defense of another. The written instructions given, however, referred to defense of another in only some of the relevant places.[5]

---

[5] The trial court's reading of the challenged instructions included language about defense of another in some places that the written instructions did not. We do not detail the variances in the court's "oral rendering," since the written version of an instruction generally controls. (*People v. Osband* (1996) 13 Cal.4th 622, 717.)

8

First, the jury was instructed under CALCRIM No. 505 in relevant part as follows (italics added):

"**505. Justifiable Homicide–*Self-Defense***

**"**The defendant is not guilty of murder or manslaughter if he was justified in killing someone in *self-defense or defense of another*. The defendant acted in lawful *self-defense o[r] defense of another* if:

     1.     The defendant reasonably believed that *he* was in imminent danger of being killed or suffering great bodily injury.

     2.     The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger.

     AND

     3.     The defendant used no more force than was reasonably necessary to defend against that danger.

". . . The defendant must have believed there was imminent danger of death or great bodily injury to *himself*. . . . [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

Second, the jury was instructed under CALCRIM No. 571 in relevant part as follows (italics added):

"**571. Voluntary Manslaughter:** *Imperfect Self-Defense*

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in *imperfect self-defense or imperfect defense of another*. [¶] If you conclude the defendant acted in *complete self-defense or defense of another*, his action was lawful and you must find him not guilty of any crime. The difference between *complete self-defense or defense*

9

*of another* and *imperfect self-defense or imperfect self-defense of another* depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in *imperfect self-defense* if:

> 1.  The defendant actually believed that *he* was in imminent danger of being killed or suffering great bodily injury;
>
> AND
>
> 2.  The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;
>
> BUT
>
> 3.  At least one of those beliefs was unreasonable.

"[¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in *imperfect self-defense*. If the People have not met this burden, you must find the defendant not guilty of murder."

Finally, the jury was instructed under CALCRIM No. 3470 in relevant part as follows (italics added):

"**3470.  Right to *Self-Defense or Defense of Another***

"*Self-defense* is a defense to shooting at an occupied vehicle . . . as charged in count 2.

"The defendant is not guilty of th[at] crime[] if he used force against the other person in *lawful self-defense*. The defendant acted in *lawful self-defense* if:

> 1.  The defendant reasonably believed that *he* was in imminent danger of suffering bodily injury;
>
> 2.  The defendant reasonably believed that the

10

> immediate use of force was necessary to defend against that danger.

> AND

> 3.      The defendant used no more force than was reasonably necessary to defend against that danger.

". . . The defendant must have believed there was imminent danger of bodily injury to *himself*. . . . [¶] . . . [¶] The defendant's belief that *he* was threatened may be reasonable even if he relied on information that was not true. . . . [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act in *lawful self-defense*. If the People have not met this burden, you must find the defendant not guilty [of] shooting into an occupied vehicle as charged in count 2."

In closing, the prosecutor argued at length that Colston did not act in self-defense, but she did not mention defense of another except when quoting one of the instructions to be given. Colston's trial counsel, however, argued both self-defense and defense of another. Defense counsel identified Harper, Lucas, and F.H. as potential people whom Colston was defending. In rebuttal, the prosecutor questioned Colston's claim that he was defending himself and those three other people. She argued that the evidence showed Harper in particular did not believe himself to be in danger.

### 2.      General legal standards

Murder is "the unlawful killing of a human being . . . with malice aforethought," and manslaughter is "the unlawful killing of a human being without malice." (§§ 187, subd. (a), 192.) Malice may be either express or implied. (§ 188, subd. (a); *People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature"—i.e., when the person intends to kill unlawfully. (§ 188, subd. (a)(1); *Gonzalez*, at p. 653.) "Malice

11

is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).)

A defendant who kills in perfect self-defense commits a "justifiable homicide" and is not guilty of a crime. (*People v. Thomas* (2023) 14 Cal.5th 327, 385–386; *People v. Elmore* (2014) 59 Cal.4th 121, 133–134.) "Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.'" (*Thomas*, at p. 386.) If a defendant kills in the actual but unreasonable belief that self-defense is necessary, the offense is only manslaughter. (*People v. Schuller* (2023) 15 Cal.5th 237, 252; *Elmore*, at p. 134.) In either case, the defendant believes the act is lawful, " ' "negating the element of malice that otherwise inheres in such a homicide." ' " (*Schuller*, at p. 252, italics omitted; *Elmore*, at p. 134.)

Under section 246, it is a crime to "maliciously and willfully discharge a firearm at an . . . occupied motor vehicle." The crime is a general intent crime, as the term "maliciously" does not refer to the murder-related concept of malice but means " 'a wish to vex, annoy, or injure another person, or an intent to do a wrongful act.'" (*People v. Watie* (2002) 100 Cal.App.4th 866, 879, quoting § 7, subd. (b)(4); see *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1167–1168.) Perfect self-defense is a complete defense to shooting at an occupied vehicle, requiring proof that the defendant reasonably believed in the imminent danger of bodily injury and the need to respond with force. (CALCRIM No. 3470; see CALCRIM No. 965; *Rodarte*, at p. 1168.) Imperfect self-defense does not apply to the crime. (*Watie*, at p. 882; accord *People v. Iraheta* (2014) 227 Cal.App.4th 611, 623–624.)

" '[The] Fifth Amendment right to due process and Sixth Amendment right to jury trial . . . require the prosecution to prove to a jury beyond a reasonable doubt every element of a crime.' " (*People v. Davis* (2013) 57 Cal.4th 353, 357; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 278; *In re Winship* (1970) 397 U.S. 358, 364.) "[B]ecause self-defense negates an element of the offense," to obtain a murder conviction the prosecution has the burden to prove beyond a reasonable doubt that a defendant did not act in self-defense. (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 570–571; *People v. Schuller*, *supra*, 15 Cal.5th at pp. 253–254; *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1252.) Similarly, "where relevant, the prosecution must establish [beyond a reasonable doubt] that the defendant did not act in [perfect] self-defense" to obtain a conviction for shooting at an occupied vehicle. (*People v. Rodarte*, *supra*, 223 Cal.App.4th at p. 1168; see CALCRIM Nos. 965, 3470.)

Here, the trial court instructed the jury on perfect self-defense as to both counts at issue and imperfect self-defense as to the murder count. But Colston claims the instructions were incomplete because they failed to include the defense of another language in the first enumerated required finding, relating to Colston's belief that he was in danger. Thus, although the challenged instructions were arguably missing such language in other places as well, we will focus on the language's omission from the first enumerated requirement in each instruction.

We review de novo "whether the trial court fully and fairly instructed the jury on the applicable law." (*People v. Bates* (2019) 35 Cal.App.5th 1, 9.) In doing so, we consider a "challenged instruction 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible

13

manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given," ' " and we interpret the instructions, " 'if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Applying this standard, we conclude there is no reasonable likelihood that the jury interpreted the challenged instructions to prevent it from acquitting Colston of murder and shooting at an occupied vehicle or convicting him of voluntary manslaughter if the jurors believed he acted in defense of another. Although Colston is correct that the first enumerated finding in each challenged instruction referred to his belief that "he" was in imminent danger, each instruction also stated elsewhere, sometimes multiple times, that it also pertained to defense of another. It is unlikely the jury would conclude it was nonetheless precluded from relying on the theory of defense of another, particularly given the parties' discussion of that theory in closing.

In resisting this conclusion, Colston makes two main points. First, he claims the enumerated findings were of paramount importance, citing the principle that "when a jury is given both general and specific instructions, 'instructions of a specific nature control over instructions containing general provisions.' " (Quoting *People v. Stewart* (1983) 145 Cal.App.3d 967, 975.) But this principle involves the interplay of separate jury instructions, not inconsistencies within a single instruction. For example, *Stewart* applied the concept in rejecting a defendant's claim that CALJIC 2.27, an instruction that the testimony of one witness is sufficient to prove any fact, permitted the jury to rely solely on an accomplice's testimony to convict. (*Stewart*, at

14

p. 974.)  The jury was also instructed with CALJIC 3.16, which "specifically identified . . . the accomplice and required that the jury find corroboration of her testimony," and the appellate court concluded that this instruction controlled over CALJIC 2.27.  (*Stewart*, at p. 975.)  Here, even if the enumerated findings are more "specific" in some sense than the balance of each instruction, for the reasons given we are unpersuaded the jury would disregard the references to defense of another in determining which findings would suffice.

Second, Colston argues that based on "expressio unius est exclusio alterius," the omission of defense of another language from the first enumerated finding in each challenged instruction would lead the jury to believe it had to find that Colston "acted to save himself alone."  That canon of interpretation provides that "where exceptions to a general rule are specified . . . , other exceptions are not to be implied or presumed."  (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 195; see *People v. Livingston* (2012) 53 Cal.4th 1145, 1165 [discussing canon in context of jury instructions].)  But again, other portions of each instruction referred to defense of another, and that theory was argued to the jury.  Thus, there is no reasonable likelihood that a juror would believe the absence of such language in the enumerated findings precluded a determination that defense of another applied.  This claim of instructional error fails.

B.      *The Trial Court Did Not Err by Giving CALCRIM No. 337.*

Colston also contends the trial court violated his constitutional right to present a complete defense by instructing the jury under CALCRIM No. 337 that a witness's custodial status "does not by itself make a witness more or less believable."  He argues the court should not have given the instruction

15

because, as a defense witness, Harper was inherently *more* credible by virtue of being in custody. We are not persuaded.

The prosecutor requested CALCRIM No. 337, and at the conference on jury instructions the trial court agreed it "should certainly be given." Colston's trial counsel did not object to the instruction's being given and successfully requested that it refer not just to Harper but to Lucas and Busby's girlfriend, who also testified while in custody.

The trial court instructed the jury under CALCRIM No. 337 as follows: "When Brandon Harper and Joshua Lucas and [Busby's girlfriend] testified, they were in custody. The fact that a witness is in custody does not by itself make a witness more or less believable. Evaluate the witness's testimony according to the instructions that I have given you on that subject."[6] Those other instructions included CALCRIM No. 226 on evaluating witness testimony generally and CALCRIM No. 302 on evaluating conflicting evidence.

The federal and state constitutions "guarantee[] criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690; *People v. Lucas* (1995) 12 Cal.4th 415, 456.) "As part of this right, a defendant is ' "entitled to adequate instructions on the defense theory of the case" if supported by the law and evidence [citation] and " 'has a constitutional right to have the jury determine every material issue presented by the evidence.' " ' " (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 793.) Thus, an instructional error that precludes the defense from presenting its theory of the case can violate this constitutional right. (See, e.g., *People v.*

---

[6] The quoted language is from the trial court's oral pronouncement. The written version omitted Lucas's and Busby's girlfriend's names, but the discrepancy does not affect Colston's claim, which pertains only to Harper.

16

*Rogers* (2006) 39 Cal.4th 826, 872; *People v. Eid* (2010) 187 Cal.App.4th 859, 879.) Again, we review this claim de novo, considering the challenged instruction in context to determine whether there is a reasonable likelihood that the jury improperly construed it. (*People v. Mitchell*, *supra*, 7 Cal.5th at p. 579; *People v. Bates*, *supra*, 35 Cal.App.5th at p. 9; see *People v. Lemcke* (2021) 11 Cal.5th 644, 652, 655.)

Colston claims that CALCRIM No. 337 "directly undercut" his theories of self-defense and defense of another because they depended on the credibility of Harper's testimony that "Busby was reaching for something seconds before he was shot and was known to own a gun."[7] Generally speaking, "CALCRIM No. 337 is essential to preserve the presumption of innocence when criminal defendants or defense witnesses testify," since jurors tend to look unfavorably on witnesses in custody. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 114.) But according to Colston, the fact that Harper was in custody made Harper's testimony for the defense *more* credible, since his status gave him "every reason to testify favorably for the state" instead. Colston argues that because the instruction "directly told jurors they could not consider" Harper's "custodial status as a factor in determining his credibility," it thwarted the defense's theories that depended on Harper's testimony.

We reject Colston's premise that Harper's custodial status, *in and of itself*, made Harper more likely to testify in the prosecution's favor. This premise is no more true than the incorrect belief CALCRIM No. 337 was primarily designed to address, that a witness in custody is inherently less

---

[7] Because Colston argues that the challenged instruction violated his right to present a complete defense, we will consider his claim on the merits despite his failure to object below. (See § 1259; *People v. Burton* (2018) 29 Cal.App.5th 917, 923.)

17

credible. To be sure, there were factors *related* to Harper's custodial status that may have supported his credibility, including the fact Harper testified for the defense despite entering a plea agreement with the prosecution. But CALCRIM No. 337 did not preclude the jury from considering such circumstances. Indeed, the jury was instructed under CALCRIM No. 226 that "[i]n evaluating a witness's testimony, [it could] consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony," including the witness's "bias" or "personal interest" and any promises of "immunity or leniency" the witness received. Thus, the jury was fully able to consider Harper's potential motivations for testifying in the prosecution's favor, other than his mere custodial status, in judging his credibility. (See *People v. Mackey*, *supra*, 233 Cal.App.4th at p. 115.) There was no instructional error, much less one depriving Colston of his right to present a complete defense.

> C.    *Colston's Ability-to-pay Claim Fails.*

Finally, Colston argues that the court operations assessment and conviction assessment should be stricken and the restitution fine stayed because the trial court imposed these charges even though evidence of his ability to pay them was lacking. We reject his claim.

At sentencing, the trial court imposed the $120 court operations assessment under section 1465.8, the $90 conviction assessment under Government Code section 70373, and the $10,000 restitution fine under section 1202.4. As a necessary corollary to the restitution fine, the court also imposed and stayed a $10,000 parole revocation fine under section 1202.45. (See § 1202.45, subd. (a).)

Colston's trial counsel did not object to the assessments. But he did object to the restitution fine, asking the trial court to "reduce" it under

18

*People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) because Colston was "indigent and serving a lengthy prison term." The court responded, "I understand. But I think since he has the opportunity of earning a salary, that that can be applied to that."

The two assessments at issue are statutorily set at a certain amount per conviction (§ 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1)), and neither statute mentions the ability to pay. Section 1202.4 provides for a restitution fine of "not . . . less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)" for any person convicted of a felony, unless the trial court "finds compelling and extraordinary reasons for not [imposing a restitution fine] and states those reasons on the record." (§ 1202.4, subd. (b)(1).) "A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine," but it "may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine." (§ 1202.4, subd. (c).) "Consideration of a defendant's inability to pay may include the defendant's future earning capacity. A defendant shall bear the burden of demonstrating the defendant's inability to pay." (§ 1202.4, subd. (d).)

In *Dueñas*, Division Seven of the Second District Court of Appeal held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" the court operations and conviction assessments. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) In addition, *Dueñas* held that "the execution of any restitution fine imposed under [section 1202.4] must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*) The issues of whether a trial court must consider a defendant's ability to pay

19

before imposing or executing such fines and assessments and which party bears the burden of proof about the defendant's ability to pay are pending before our state Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

Relying on *Dueñas*, Colston claims the trial court erred by imposing the challenged assessments and restitution fine.[8] To begin with, we conclude that he forfeited his challenge to the assessments by failing to object to them below. "In general, a defendant who fails to object to the imposition of fines and fees at sentencing forfeits the right to challenge those fines and fees on appeal." (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 224.) Colston objected to the restitution fine based on his inability to pay, but he did not make any objection to the assessments. Thus, we will not disturb them.

We also reject Colston's challenge to the restitution fine. Following *Dueñas*, the same division of the Second District Court of Appeal clarified that "a defendant must in the first instance contest in the trial court [the defendant's] ability to pay the fines, fees[,] and assessments to be imposed and at a hearing present evidence of . . . inability to pay the amounts contemplated by the trial court[, which] . . . then must consider all relevant factors in determining whether the defendant is able to pay . . . . Those factors may include, but are not limited to, potential prison pay during the period of incarceration to be served by the defendant." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.) "Other courts, following *Castellano*, have concluded 'that the evaluation of ability to pay must include future ability to

---

[8] Citing several decisions that disagreed with *Dueñas*'s analysis, the Attorney General argues that "the proper analytic framework is that of the excessive fines clause of the Eighth Amendment." Colston does not rely on the Eighth Amendment, and we will assume for purposes of our discussion that *Dueñas* was correctly decided.

pay,' and [the] 'defendant bears the burden of proof on that issue.' " (*People v. Montes* (2021) 59 Cal.App.5th 1107, 1122.)

Colston fails to grapple with his burden to prove his inability to pay the restitution fine or, alternatively, to explain why we should disregard the above caselaw and conclude that the burden is not his. Although he characterizes the trial court's statement that he could earn sufficient prison wages as "speculati[ve]," he fails to point to any evidence in the record suggesting he is unable to work or cannot earn enough during his long incarceration to pay the restitution fine. Colston emphasizes that his trial counsel said he was "indigent," but this does not address his *future* ability to pay.

On that issue, the probation report noted Colston's prior employment in various jobs, including as a mechanic, and there is no evidence of any physical or mental condition that might impede his ability to work. Nor does Colston attempt to demonstrate that the (admittedly low) prison wages he could earn would be insufficient. Finally, he does not identify any other relevant evidence that he was precluded from presenting. Thus, we conclude that any error in imposing the restitution fine without a hearing on his ability to pay was harmless beyond a reasonable doubt. (See, e.g., *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060–1061; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076–1077.)

## III.
### DISPOSITION

The judgment is affirmed.

21

_____

Humes, P. J.


WE CONCUR:



_____

Banke, J.



_____

Langhorne Wilson, J.


*People v. Colston*  A169445